[Cite as *In re K.B.F.*, 2012-Ohio-1855.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

IN RE: K.B.F.                                :

                                             :          C.A. CASE NO.    24891

                                             :          T.C. NO.    JC2008-6551

                                             :          (Civil appeal from Common
                                                         Pleas    Court,    Juvenile
Division)
                                             :

                                             :

                                   . . . . . . . . . .

                              **O P I N I O N**

                 Rendered on the ___27th___ day of ____April____, 2012.

                                   . . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W.
Third Street, 5th Floor, Dayton, Ohio 45422
         Attorney for Plaintiff-Appellee State of Ohio

GARY C. SCHAENGOLD, Atty. Reg. No. 0007144, 4 East Schantz Avenue, Dayton, Ohio
45409
         Attorney for Defendant-Appellant K.B.

                                   . . . . . . . . . .

DONOVAN, J.

        **{¶ 1}**    This matter is before the Court on the Notice of Appeal of K.B. filed

October 25, 2011. K.B. appeals from the October 11, 2011 decision of the juvenile court which overruled her objections to the March 25, 2011 decision of the magistrate granting permanent custody of K.B.'s daughter, K.B.F., to the Montgomery County Department of Job and Family Services - Children Services Division ("Agency"). K.B. also has a son, who was born in 2007, who is not the subject of this appeal.

**{¶ 2}** On July 16, 2008, the Agency filed a Neglect and Dependency Complaint, in which it stated that it had received "numerous referrals" regarding K.B. The Agency alleged that K.B. repeatedly left K.B.F., whose date of birth is August 12, 2004, and her brother, "for hours and days at a time," in the care of K.B.F.'s maternal grandmother, who is "wheelchair bound and has Parkinson's disease," and who was accordingly unable to care for the children. The complaint further alleged that the maternal grandmother currently resides in an assisted living facility, and that K.B. lacked stable housing. The complaint identifies the alleged father of K.B.F. and indicates that his address is unknown. After appointing a Guardian ad Litem ("G.A.L.") for K.B.F., and conducting a hearing, the magistrate determined, on August 14, 2008, that it was in the best interest of K.B.F. to remain in her home under the interim protective supervision of the Agency.

**{¶ 3}** On September 5, 2008, the magistrate issued an order of adjudication, finding K.B.F. dependent. On November 3, 2008, the magistrate issued a decision and order of protective supervision, and the magistrate approved of the Agency's case plan objectives for K.B. and incorporated the case plan as an order of the court.

**{¶ 4}** On December 16, 2008, the Agency filed a motion for temporary custody of K.B.F. The attached affidavit of Donita Burks states that K.B. "continues to engage in

behaviors hazardous to [K.B.F.] and has ignored the Court-ordered case plan." The affidavit further states that K.B. left K.B.F. with the child's maternal grandmother on December 4, 2008, despite being ordered in her case plan not to do so, and it further alleged that she left K.B.F. and her brother alone at other times. The affidavit states that on October 23, 2008, there "was a domestic violence incident" between K.B. and her "paramour," and that K.B. refused to engage K.B.F. in domestic violence counseling, as ordered in her case plan, "because she does not believe it is necessary." The affidavit provides that K.B. did not begin parenting classes as required by her case plan, that she refused "Help Me Grow" services, and that she has not had the required Crisis Care Assessment. According to the affidavit, K.B. has reported a history of depression, and "she is currently having suicidal ideation."

{¶ 5} On December 23, 2008, after a hearing, the magistrate granted interim temporary custody of K.B.F. to the Agency. On May 4, 2009, the magistrate granted temporary custody to the Agency.

{¶ 6} On November 2, 2009, the Agency filed a motion to extend temporary custody. The attached affidavit of Donita Thompson provides that K.B. has not completed her case plan objectives, has no stable housing, misses 1-2 visits with K.B.F. each month, and is working at Cheeks Gentleman's Club. On February 8, 2010, the magistrate granted the Agency's motion, extending the period of temporary custody to June 16, 2010. On April 8, 2010, the Agency requested a second extension. The attached affidavit of Krista Walakonis states that K.B. has made limited progress on her case plan, that she is "possibly going to lose her housing and is not employed at this time." The magistrate granted the

second extension on June 30, 2010.

{¶ 7}     On October 6, 2010, the Agency filed a motion seeking permanent custody of K.B.F.   The attached affidavit of Donita Thomspon provides that K.B. has attended "approximately 50%" of  her scheduled visitations with K.B.F. and has not completed her case plan objectives.   It further states that K.B. "is losing her housing and reports having no income."

{¶ 8}     At the permanent custody hearing, on March 17, 2011, Donita Thompson testified that she has been involved in the matter since March, 2008, and that K.B.F. has been in her current foster home since November, 2009.   According to Thompson, K.B.F. is "thriving in her current placement," and she is an honor-roll student with perfect attendance.  Thompson further stated that K.B.F. is also involved in the church she attends with her foster mother.   Thompson stated that K.B.F. has special needs, having been diagnosed with "Adjustment Disorder, Reactive Attachment Disorder, ADHD, PTSD, and Parent-Child Relational Problem."   Thompson stated that K.B.F. also receives treatment for asthma.  Thompson stated that K.B.F. exhibited "a lot of negative behaviors" when she was first placed in foster care.   Thompson stated that K.B.F. had eating problems and would regurgitate her food, and she "was having poor impulse control, a lot of manipulation, * * * at one point very sexually inappropriate behaviors."   Thompson stated that K.B.F. reported witnessing, in K.B.'s home, some of the sexually inappropriate behavior that she exhibited.  She stated that K.B.F. had been in weekly counseling since January, 2009, and that within the last two months, due to her progress, she began to see the counselor on a bi-weekly basis.  Thompson stated that K.B.F.'s therapist did not approve of K.B.'s participation in her

therapy due to her "inconsistency with visits." According to Thompson, K.B.F.'s father has never been a part of her life. Thompson stated that K.B.F. has exhibited "drastic improvement" in her current foster home. Thompson stated that K.B.F. calls her foster mother "mom," and that she is very bonded to her and to the foster mother's extended family. Thompson stated that the Agency had initially recommended that no other children be placed in the home due to K.B.F.'s negative behavior, and that K.B.F. was the only child in the home for over a year. She stated that there are now two other foster children in the home.

{¶ 9} Thompson stated that K.B. completed a parenting and psychological assessment in April, 2009, and that her case plan was developed as a result of the assessment. Thompson stated that she believed K.B. understood what was required of her, but she "would often say, I haven't made this appointment, I just haven't gotten around to it, or things like that." Thompson stated that K.B.'s objectives were to complete "domestic violence counseling as recommended by the parenting and psychological assessment, that she will participate in and complete a parenting education program, that she'll maintain stable, independent housing with utilities in her name," maintain stable, independent income, maintain a consistent visitation schedule with K.B.F. and participate in K.B.F.'s therapy as recommended.

{¶ 10} Thompson stated that, before K.B.F. was removed from the home, the Agency became aware that she had witnessed domestic violence between K.B. and her "paramour," and that in one incident, K.B.F was pushed. She stated that the Agency required in the case plan that K.B. enroll K.B.F. in the children's domestic violence program

at Artemis, but that K.B. did not follow through. Thompson stated that K.B. was referred several times to Artemis House and PATH for her own domestic violence counseling as well. She stated that while K.B. was referred to Artemis in October, 2008, she did not begin attending the program until April, 2009. She completed the program in November, 2009, according to Thompson. During the interim period, Thompson stated that K.B. was referred to PATH for domestic violence counseling. She stated that K.B. began counseling at PATH in January, 2010, but was discharged in April, 2010 for noncompliance. Thompson stated that K.B. advised her that she stopped attending because she did not want to pay the per session fee of $1.00. Thompson stated that she was away from the Agency on maternity leave from March, 2010 until July, 2010, and that when she returned to work, K.B. was receiving domestic violence counseling at Oasis House. At the time of the hearing, Thompson stated that weekly counseling was ongoing via telephone because the counselor was no longer working at Oasis House.

{¶ 11} Thompson further stated that K.B. had not completed parenting skills education. Thompson stated that K.B. was referred to Parent Link in 2008, and she was discharged from the program in December, 2010, because of inconsistent attendance. Thompson stated that she referred K.B. to Catholic Social Services, and that K.B. told her that she did not attend the program there because the agency no longer offered it and there is an age limit. Thompson stated that she contacted Catholic Social Services "and they said that their program is still up and running and there is no age limit." Thompson testified that she relayed that information to K.B., who never followed through. Thompson next referred K.B. to the PACE program, and she stated that K.B. was to begin that program on February

28, 2011. The program time conflicted with K.B.'s visitation with K.B.F., however, and K.B. attended the visitation instead. Thompson stated that K.B. is signed up to begin a parenting class on April 18, 2011.

{¶ 12} Regarding housing, Thompson stated that K.B. has not met her case plan objective. Thompson stated that in December, 2010, K.B. moved into a two bedroom apartment on Stop Eight Road, and that a friend of K.B.'s named "Rachel" is listed on the lease. Thompson stated that K.B. told her that Rachel pays a portion of the utility bill. Thompson stated that K.B. denies that Rachel resides there, but that when she visited the apartment, Rachel appeared to be living there. She stated that the Agency did not perform a background check on Rachel and that, given her presence in the apartment, Thompson did not consider the apartment an appropriate placement for K.B.'s children. Even if Rachel were not present, Thompson stated that she had further concerns about the apartment due to K.B.'s tobacco usage. Thompson stated when she visited K.B. there was "a strong odor of cigarette smoke," and that she spoke to K.B. repeatedly about the importance of not smoking in the apartment due to K.B.F.'s asthma.

{¶ 13} Prior to moving into the apartment, Thompson testified that K.B. resided for three months with friends in Huber Heights, and that K.B. never allowed Thompson access to that residence. Prior to that, K.B. resided in a three-bedroom apartment on Wyoming Street from December, 2009, through August, 2010, with Rachel and Rachel's brother, Isaac. According to Thompson, that residence "was also often very dirty with a foul odor, overflowing cat litter." Thompson stated that prior to the Wyoming address, K.B. "had about three different addresses * * *in 2009. She stayed in two different

apartments on Gummer, also a period of time she stayed in Centerville in an apartment with a friend." Thompson stated that when the Agency first became involved, K.B. resided with her mother, and the home contained clutter, and pet urine and feces.

{¶ 14} Regarding K.B.'s income, Thompson stated that she has had several different jobs and unstable income that has been difficult to verify. She stated that she referred K.B. to the Job Center, Dayton Urban League and Oasis House for help finding work. She stated that K.B. did not go to the Job Center or Dayton Urban League, but that she received counseling at Oasis House beginning in July, 2010. Thompson stated that K.B. was initially unemployed, and that she then worked at a store in the Dayton Mall for a period of time, as well as a call center, a distribution center, a fast food restaurant, and KC Lounge. At the time of the hearing, Thompson stated that K.B. reported that she was employed at Flamingo's strip club, earning $300.00 a week.

{¶ 15} Regarding K.B.'s visitation with K.B.F., Thompson stated that she has weekly visits scheduled at the Agency for four hours. She described K.B.'s attendance as "very inconsistent," and she testified that from July, 2009 to December, 2010, K.B. missed almost half of her visits. Since December, 2010, Thompson stated that K.B.'s visits have been more frequent, although she missed two visits and arrived late at least three times. Thompson stated that a late arrival results in cancellation of the visit. Thompson stated that her last missed visit was on March 7, 2011. Thompson stated that K.B.F. had been transported to the Agency on that day, and K.B.F. was upset when K.B. was not there.

{¶ 16} Since the frequency of K.B.'s visitations have increased, Thompson stated that the visitations have become more meaningful to K.B.F. According to Thompson, K.B.

"interacts very well with [K.B.F.] She usually brings a meal. She will help [K.B.F.] with homework. She often carries her around or has her sitting on her lap. That's not always been the case." Thompson stated, from the Agency perspective, although K.B. has improved, the visitation objective in the case plan has not been met.

{¶ 17} Thompson stated that she met with K.B.F.'s father three times after he was located in October, 2010, and that he indicated that he did not want to have any contact with his daughter. Thompson stated a child support order is in place, but that he does not make payments. He last saw K.B.F. in March, 2008, according to Thompson. She stated that there are no known paternal relatives beyond the father.

{¶ 18} Thompson stated that K.B. requested that the Agency complete a home study on her uncle, who lives out of state, and she stated, "those relatives failed to complete the home study process." A home study of K.B.'s mother failed due to her health problems, according to Thompson.

{¶ 19} Finally, Thompson stated that she believes it is in K.B.F's best interest to remain in Agency custody. Thompson testified that K.B.F.'s current foster mother is willing to adopt K.B.F., and she stated that the Agency is not aware of any obstacles to the adoption. Thompson stated that K.B.F. has indicated "that she would be happy with the foster mom adopting her."

{¶ 20} On cross-examination by counsel for K.B., Thompson stated that K.B.F.'s foster mother is single, and that she has adult children of her own. She testified that K.B.F. had been in three other foster homes prior to her current placement. When asked if K.B.'s failure to participate in K.B.F.'s therapy was not the fault of K.B. but due to the refusal of

the therapist to allow K.B. to participate, Thompson responded, "the provider had a reason for not allowing her into the therapy, which was directly the fault of your client." Thompson acknowledged that the objective for domestic violence counseling was in progress. Regarding the parenting skills objective, Thompson stated that, while the class K.B. was originally scheduled to take conflicted with her visitation schedule, the visitation could have been changed to accommodate the class, but K.B. did not communicate with Thompson in a timely manner to arrange the change. According to Thompson, K.B. "expressed an interest in going to the class. She had not contacted me at all once she found out it would be Monday during the same time as her visit until February 25th, which was that Friday before the class was to start." Regarding her observations of K.B. with K.B.F. during visitations, she stated that K.B.'s interactions with her daughter have improved in the last four months, and that there is a strong bond between K.B. and K.B.F., and she further testified that since December, K.B. has visited more consistently than in the past. Thompson stated that K.B. provided documentation that she was ill and had gone to the hospital for treatment after one of her recent missed visits. Regarding the Agency policy of cancelling visitation if K.B. was late, Thompson stated, "we've had to enforce that more strictly because of her number of no-shows, and the children were transported, and she just didn't show at all. [K.B.F.] would become very emotional and upset. That would last for days after her mom just not showing."

{¶ 21} When asked about the Agency's concerns about Rachel sharing expenses with K.B. while the children are in Agency custody, Thompson stated that she would "like to see her be able to maintain a home independently, as it's listed on the case plan, to show that

she can provide and maintain rent and utilities independent of someone else, because if she's relying on them now, it might become problematic if that person is no longer in the home and the children are there." Thompson acknowledged that K.B. could cover her rent of $490.00 a month with her $300.00 a week income. Thompson stated that while K.B. reportedly has worked at Flamingos for over a year, she did not inform Thompson about her job in 2010, and she has not provided "any statement on how long she's been employed there," or any income tax documentation. According to Thompson, she "asked [K.B.] several times in 2010, and she did not indicate at any point that she was employed. What she most often said is that she was working odd jobs to earn income." Thompson stated that the Agency is not concerned about the particular type of job that K.B. has, as long as she has stable income and is able to provide stable child care. Finally, regarding the wishes of K.B.F., Thompson stated that the child told her that she wants to have "two mommies," and that she wanted to "be with her mom as well as foster mom. She's not ever said to me exclusively that she wants to be with her mom."

{¶ 22} On cross-examination by counsel for K.B.F., Thompson stated that K.B.F. has her own bedroom in her foster home, that she is closely bonded to her foster family, and that she is doing well in school. Thompson stated that the foster mother has not indicated that she intends to bring additional children into the home. Thompson stated that the foster mother moved the family to a new home a month ago, and that the move "seems to have affected [K.B.F.] in a positive way. She seems to like this current home a lot better, the neighborhood, larger yard to play in, so on. She seems to enjoy being in the new home."

{¶ 23} Donna Cox testified that she is a licensed professional counselor, and she

has provided counseling to K.B. since July 22, 2010.    She stated that she saw K.B. weekly until the first part of February, when they began "telephone consultations" because of "the ice storms and snow storms that we had that came through Ohio, and there was also a transition from Oasis House to my private counseling practice * * * ."   Cox stated that she previously worked at Oasis House as a volunteer.   When asked about the nature of her practice, Cox stated that she does "marriage counseling, post-traumatic stress, domestic violence, any of the women's issues.   I also provide clergy care * * * and I also help with impaired physicians, and I also see law enforcement personnel."

{¶ 24}   When asked to discuss K.B.'s progress, Cox responded, "she really has been very compliant with treatment adherence.   She is very resourceful, and she works very hard in counseling, and I've always been pleased with her progress."   Cox stated that K.B. missed one appointment due to illness and three other appointments due to inclement weather.   In addition to the formal "telephone consultations," Cox stated that she and K.B. exchange additional phone calls and text messages, and "the rate there is usually two average per week."   Cox stated that she provided domestic violence counseling to K.B., and she stated that she believed that case plan objective had been completed.   She stated that she recommended that K.B. participate in K.B.F.'s therapy, but that the Agency was not "open to that happening even though that was my recommendation."   According to Cox, the Agency was "looking for consistency, which was confusing, because she was being consistent with my counseling sessions, and so that's what I was basing it on."   Cox stated, regarding the Agency, that she "felt like there was more like discouragement rather than encouragement * * * from them * * * regarding my client."   Cox testified, "I felt that my client was making

an effort, and I felt that their response was that she wasn't making an effort."

{¶ 25} When asked about K.B.'s feelings for her children, Cox replied, "she has very loving feelings towards her children, * * * there was talking about the developmental stages her children were in, what she was seeing them accomplish during her visits." Cox stated that she never observed K.B. with her children. She testified that she is willing to continue working with K.B. as long as K.B. needs counseling.

{¶ 26} On cross-examination, Cox stated that the Agency made her aware of K.B.'s inconsistent visitation and lack of stable housing. Cox testified that she would continue to work with K.B. on a pro bono basis, and she stated that K.B. is still in need of counseling. Cox acknowledged that K.B.F.'s therapist is in the best position to determine whether K.B.'s participation in K.B.F.'s therapy is in the child's best interest. Cox stated that she has never met K.B.F.

{¶ 27} K.B. testified that when her children were removed from her care, she had just moved into her mother's apartment. She stated that previously she "had an apartment upstairs, but my income wasn't sufficient enough to sustain that, so I moved downstairs with my mom." K.B. stated that she is 22 years old, and K.B.F. is six. K.B. stated that she completed the parenting and psychological evaluation "pretty quickly." The following exchange occurred regarding her case plan objectives:

Q. How do you feel like you were able to progress on your case plan during that first year, from 2008 - 2009?

A. There wasn't much progression the first year.

Q. * * * And why was that?

A.   Honestly, I didn't take it seriously, to be honest.   * * * things about Children Services I had heard, I had thought that they took kids for abuse and things like that, and my kids were fed, they were not abused, anything like that, so I didn't think they would keep them from me, so I didn't take it seriously at all.

Q.   And how old were you when they were first taken out of your care?

A.   I was 18.

{¶ 28}   K.B. stated that she completed the Artemis program, and that she "took way longer than I should have to do it."   She stated that she began PATH in December, 2009 or January, 2010.   According to K.B., "they wouldn't give me a set price," and she stated that she  "just didn't feel that it was really helping me, so I stopped going and started looking into different domestic violence classes."   She confirmed that she began counseling with Cox in July of 2010, and she stated that in addition to the Agency referral to Oasis House, she "had got hooked up with Oasis House through my work, because they would come and -- into [Flamingo's] and talk to the girls."

{¶ 29}   The following exchange occurred regarding the consistency of her visitation:

Q. * * * At that beginning time, that first year, year and a half of your case plan, were you visiting with the children regularly?

A.   No.

Q. * * * what [were the] reasons for that?

A.   Whatever reason I had at the time.  It was only about the first

year that I was really inconsistent. When Donita went on maternity leave and I had her replacement caseworker for that time, I started to become a lot more consistent and trying a lot harder to get there.

* * * it's no excuse, but it's hard without a car, and it's harder trying to rely on other people and bus transportation, because I was late on one of my visits and didn't get to see my kids because the bus was late, so I arrived five minutes late.

Q. What happens when you arrive late to a visit?

A. It's cancelled. Well, for my daughter at least.

{¶ 30} The following exchange occurred regarding the tenor of K.B.'s visitations with K.B.F.:

Q. How do you feel your visits go when you have your visits with [K.B.F.]?

A. For the most part pretty good. Sometimes she's a little harder to handle than others. It depends on her mood. But, you know, she's a good kid, so it's pretty easy most of the time, and she - - she made it a lot easier for the most part.

Q. * * * do you feel like your visits have improved over the last couple years then?

A. I honestly don't necessarily see improvement. I never really saw a problem with my visits. I do agree that some of my talk about my case plan with her was inappropriate in the sense that she would ask me things,

and I didn't go about telling - - explaining it the right way. I was using more adult terms than I should have. But, you know, for the most part, I've always thought that my interaction with [K.B.F.] has been good.

You know, during the summer I take her to the park that's at Children Services. You know, during the winter I try to let her watch movies, help with homework, play games, read. So I have never really saw a problem. * * *

{¶ 31} Regarding the parenting classes that conflicted with K.B.'s visitation, K.B. testified, "* * *I did wait probably a couple days too long to get in touch with Donita, but I called her on that Friday to see what we could do about switching visits or if I could cut it an hour short or - - and it wasn't possible at that time." K.B. stated that she chose to attend her visitation instead of the parenting class. K.B. stated that she is to begin an eight-week parenting class in April.

{¶ 32} When asked if she had made any arrangements for day care for K.B.F. while she is at work, K.B. responded, "* * * I have had Title 20 before. I don't know how it will work with my present income, but I do have a few people who are willing to care for my daughter until I can either put her in day care or, you know, figure out a more permanent plan."

{¶ 33} K.B. stated that she began working at Flamingo's in February, 2010. K.B. stated that she quit her job at the KC Lounge "because the money wasn't enough for me to cut off my hours at Flamingo's." When asked why she did not advise Thompson that she was working at Flamingo's in 2010, she stated that she told the caseworker filling in while

Thompson was on maternity leave that she worked there, and " * * * I asked her if it was an appropriate job, because the reason why I had lied about it was because I was nervous that it would look bad on me, that you know, it was not going to be viewed as appropriate and that would hinder my case." K.B. stated that "if I'm working what I plan to work if I were to regain custody of my daughter, on average" she would make $300.00 a week.

{¶ 34} K.B. stated that she signed the lease on the apartment on Stop Eight Road in November, 2010, and she moved into it in December, 2010. According to K.B., she "needed a co-signer because I couldn't get it because I do have a previous eviction from 2008." She stated that her rent is $490.00 a month, her DP&L bill is between $45.00 and $60.00, her cell phone bill is $60.00 a month, and she spends about $70.00 a month on food. She stated that the cable television at the apartment is in Rachel's name, and that it will "probably get cut off" because "previously I owed Time Warner a lot of money, so that's why it's not in my name." According to K.B., Rachel is "in the process of moving out" of the apartment. K.B. stated that the two beds in the apartment are "both mine." Regarding the sleeping arrangements in the event her children were to be returned to her, K.B. stated, "I haven't quite figured out what I was going to do because of visitation with my son and him being there for weekends. I guess, you know, maybe give him my room when he's there, but [K.B.F.] - - my plan is to have [her] have her own room no matter what." K.B. further stated that K.B.F. would have "her own room like for the majority of the time."

{¶ 35} K.B. stated that her participation in K.B.F.'s therapy was a case plan objective, "but they said due to inconsistency with my visits, they wouldn't allow me." When asked if she felt it were now appropriate for K.B.F. to be returned to her care, K.B.

responded, "I mean, there would be obviously a period of adjustment, but yes, I mean, I - - the last thing I would want is to lose my daughter out of my life."

{¶ 36} On cross-examination, K.B. stated that she lost custody of her son after a hearing on January 27, 2011, and that he was placed with paternal relatives. When asked when she began to take her case plan objectives seriously, K.B. responded, "I started taking it a little more seriously in August of 2009, but I really, really put more effort in in May 2010, yeah." When asked what made her get serious, she responded, "Reality hit me in the face." She cited K.B.F.'s birthday in August of 2009 and "just a lot of factors really kind of made me wake up and realize * * * I wasn't going about things the way I should."

{¶ 37} When asked who she relied on for child care when her children lived with her, K.B. replied, "my mom was the easiest person because I lived with her, you know, so I mostly went for her. * * * on the occasion in which resulted in me coming to court, yes, I did have a friend fall through because - - whatever the situation was, I don't remember." K.B. stated that since the children have been removed, her mother has been placed in a nursing home. K.B. stated that her work hours are 7:00 p.m. until 2:30 a.m., and she stated that "Early Learning Tree on Main Street is open 24 hours," and that it costs about $130.00 a week for child care. K.B. stated that she has a child support obligation of "$50 a month per child." When asked if Rachel had been paying the rent at the apartment, K.B. stated, she "has helped in the past. As of the past couple months, I've been paying rent by myself, but she has been paying some of the other bills." K.B. stated that she and Thompson exchanged voice mails on March 7, 2011 when K.B. missed her visitation, and she called Thompson back to "let her know that I was going to attempt to come, because I had thrown my back out

trying to move a couch, and I was going to attempt to come and to call me back if that was okay, and then I never heard anything from her after that." K.B. stated that K.B.F. has reported to her that she has a good relationship with her foster mother, and that she is doing well in school. When asked about any available family members with whom to place K.B.F., K.B. stated that she has a sister with whom she has no contact.

{¶ 38} At the conclusion of the hearing the court asked the G.A.L if he had anything to add to his latest report, and he stated that he had recently seen K.B.F., after completing his report, and that she "shared with me that she wanted to stay with the foster mother, and that was not solicited." We note that the G.A.L.'s most recent report, filed March 15, 2011, indicates that he visited K.B.'s residence on March 12, 2011. The report provides in part, "Mother feels that God has a plan, but feels that, financially, [K.F.B.] would be better off with Foster Mother." The report further describes K.B.'s apartment, and indicates that K.B. has two dogs and a cat in the home, and that the "spare bedroom and dining area had dog feces on the floor." The G.A.L. recommended that the Agency be granted permanent custody of K.B.F.

{¶ 39} The magistrate found that the Agency made reasonable efforts to prevent K.B.F.'s removal, to eliminate her continued removal, and to make it possible for her to return home. The magistrate further found that there are no relatives or non-relatives able to accept custody of K.B.F, that she has been in foster care since December 22, 2008, for 12 or more months out of the last 22 months. The magistrate found that K.B.F. is a special needs child, and that her negative behaviors have greatly improved in foster care. The magistrate found that K.B.F. is very bonded with her foster family and integrated into her foster

mother's immediate and extended family. The magistrate noted that K.B.F. is in the first grade and doing very well in school with perfect attendance, and that she is involved in her church. The magistrate noted that K.B.F. is six and a half years old and too young "to understand the complexities of permanent custody." According to the magistrate, he conducted an in camera hearing with the child and noted that she did not have "sufficient maturity to adequately express her wishes." The magistrate noted that K.B.F. stated that she has "two mommies, and that her foster mother provides the care of her while she visits with her biological mother." The magistrate stated that in his report the G.A.L. noted that K.B.F. "has had great difficulty expressing where she wants to live and that the discussion has been very upsetting to her." The magistrate then noted the G.A.L.'s statement at the conclusion of the hearing that K.B.F. recently stated that she wants to remain with her foster mother, and the magistrate noted that K.B.F.'s "attorney did not present any contradictory evidence."

{¶ 40} The magistrate found that placement of K.B.F. with "the mother and father is a threat to the child's safety." The magistrate found that the father has abandoned K.B.F. The magistrate noted the objectives as set forth in K.B.'s case plan and found that K.B. understood them. Specifically, the magistrate found that K.B. completed the parenting and psychological assessment in April, 2009. Regarding domestic violence counseling, the magistrate found that K.B. failed to take K.B.F. to counseling at Artemis as recommended. The magistrate found that, after having been referred to Artemis and PATH in October, 2008, K.B. did not complete the four week class at Artemis until November, 2009. The magistrate found that K.B. began attending PATH in January, 2010 but was discharged for noncompliance. The magistrate found that K.B. has received domestic violence counseling

that commenced at Oasis House in July, 2010, and continues on a pro bono basis with Cox. The magistrate noted that K.B. missed appointments due to illness and inclement weather. The magistrate concluded that the domestic violence counseling objective was in progress.

{¶ 41} Regarding parenting classes, the magistrate noted that K.B. was referred to Parenting Link in 2008 prior to the removal of her children, was noncompliant, and was discharged. The magistrate found that K.B. failed to follow through with referrals to Catholic Social Services, but that within the past month she enrolled in a parenting program which begins in April, 2011. The magistrate found that this objective has not been met.

{¶ 42} Regarding housing, the magistrate noted that in 2008, K.B. was only 18 years old and living with her ill mother, in an unsanitary home. The magistrate found that in 2009, K.B. lived in three different apartments. From December 2009 until August 2010, the magistrate found that K.B. lived with "Rachel" and "Isaac" in Dayton; from August, 2010 through December, 2010, she lived in Huber Heights, and her contact with her caseworker during that time was infrequent. The magistrate found that K.B. failed to schedule a home visit with her caseworker or G.A.L. when she lived in Huber Heights. The magistrate found that K.B. has resided in her current apartment since December, 2010, and that "Rachel" assists with expenses. The magistrate concluded that K.B. "has never maintained independent housing and does not currently have independent housing."

{¶ 43} Regarding K.B.'s income, the magistrate found that she has a "history of unstable income and employment." The magistrate found that K.B. failed to provide employment information regarding her work at Flamingo's to her caseworker until January, 2011, because she was concerned "her position at Flamingo's would be detrimental to her

case." The magistrate found that while K.B. reports that she has been employed at Flamingo's for the last year, she reported five or six different employment positions from 2008 to the present. The magistrate further noted that K.B. has not provided check stubs or tax records demonstrating steady employment, despite repeated requests, and that she has not provided rent receipts or utility bills. The magistrate noted that the Agency provided K.B. with multiple referrals to job seeking services, and that K.B. did not take advantage of them. The magistrate found this objective to be in progress.

{¶ 44} Regarding visitation, the magistrate noted K.B.'s inconsistency, having missed "about fifty percent" of her visits from July 2009 through December 2010. The magistrate further noted that the Agency accordingly required K.B. to arrive prior to the visitations so that K.B.F. would not be transported there until K.B.'s attendance was confirmed, "to lessen the harmful impact on" K.B.F. The magistrate found that K.B. missed two visits and appeared late for three visits from December, 2010 until March, 2011, and K.B.'s late arrivals resulted in cancellations. The magistrate further noted Thompson's testimony that K.B. and K.B.F. are bonded, and that K.B.'s interactions with K.B.F. have improved. According to the magistrate, K.B. "has a very immature and cavalier attitude toward her case plan and reunification and did not want to accept that her actions and inactions led to the removal and that only through consistency and stability would her children be returned to her." The magistrate found that this objective is in progress, and that her overall progress on her case plan "can only be described as minimal." Finally, the magistrate noted that the G.A.L. recommended that the Agency be granted permanent custody.

{¶ 45} Pursuant to R.C. 2151.414(E), the magistrate concluded that there is clear and convincing evidence that K.B.F. cannot be placed with either parent within a reasonable time for the following reasons: (1) the parents "have continuously and repeatedly failed to substantially remedy the conditions causing the child to be placed outside of the home despite reasonable case planning and diligent efforts" by the Agency; (2) the parents demonstrated a lack of commitment toward the child; (3) the foster mother has provided a stable and nurturing environment; (4) the child has expressed that she wants to live with her foster mother; (5) the child has been in foster care for over 20 months; (6) the parents have failed to demonstrate that they will become an appropriate custodian in the foreseeable future, and no other relative has been identified to undertake the child's custody; (7) none of the factors set forth in R.C. 2141.414(E)(7) to (11) apply; and (8) it is in K.B.F.'s best interest to be placed in the permanent custody of the Agency. The magistrate terminated K.B.'s parental rights.

{¶ 46} K.B. filed four objections to the magistrate's decision on April 6, 2011, which she supplemented on May 18, 2011. K.B. objected to the Magistrate's conclusion that she failed to remedy the conditions causing K.B.F.'s removal; she objected to the magistrate's conclusion that she has demonstrated a lack of commitment to K.B.F.; she objected to the magistrate's conclusion that she would not be able to be a suitable and appropriate custodian in the foreseeable future; and she objected to the magistrate's conclusion that it is in the best interest of K.B.F. to grant permanent custody to the Agency. In her supplemental filing K.B. emphasized the bond between her and K.B.F., and that she has adequate housing and stable income. She further asserted that the Agency "was more

discouraging than encouraging" about her progress with her case plan objectives. The Agency filed a response on June 16, 2011.

{¶ 47} In its Decision overruling K.B.'s objections, after noting the magistrate's findings of fact and conclusions of law, and summarizing K.B.'s objections and the Agency's responses thereto, the trial court overruled K.B.'s objection to the magistrate's finding that she failed to substantially remedy the conditions causing removal, despite diligent efforts by the Agency. Regarding K.B.'s objection to the magistrate's conclusion that K.B. demonstrated a lack of commitment to K.B.F., the court cited K.B.'s own testimony that she did not initially take her case plan objectives seriously or believe that the Agency would keep her children, as well as Thompson's testimony that K.B. did not begin to fulfill the case plan requirements until April, 2009. The court noted that K.B. had not completed parenting classes, and that she did not begin counseling at Oasis House until June, 2010. It was significant to the court that Cox stated that K.B. still needed therapy. The court determined that K.B. "demonstrated a lack of commitment toward the Child and has failed to complete recommended parenting classes and domestic violence counseling per recommendation of the assessment."

{¶ 48} Regarding K.B.'s ability to be a suitable custodian of K.B.F. in the future, the court noted that K.B. has not demonstrated an ability to maintain stable, appropriate, independent housing, noting that since K.B.F's removal, K.B. has resided in seven different residences. Thompson's concern about the strong smell of cigarette smoke in the home was of significance to the court, as well as the potential ongoing presence of Rachel in the home. Finally, the court cited K.B.'s inconsistent employment history and determined that K.B.'s

income of $1200.00 a month at Flamingo's was insufficient to cover her monthly expenses, which the court determined totaled $1275.00 a month (Rent: $490.00, DP&L: $45.00, cell phone: $60.00, food: $70.00, child support: $100.00, and daycare: $520.00 per month). Finally, the court acknowledged "that [K.B.] was young when she had [K.B.F.], but when the child was removed from the home, [K.B.] was 18 years old and has had over two (2) years to complete her case plan objectives." The Court concluded that K.B. failed to complete her case plan objectives and that permanent custody to the Agency is in K.B.F.'s best interest.

{¶ 49} K.B. asserts three assignments of error. We will consider her first and second assignments of error together. They are as follows:

"THE TRIAL COURT ERRED IN FINDING THAT THE CHILD COULD NOT BE PLACED WITH [HER] MOTHER WITHIN A REASONABLE TIME OR SHOULD NOT BE PLACED WITH MOTHER BECAUSE OF A LACK OF COMMITMENT."

And,

"THE TRIAL COURT ERRED IN FINDING THAT A GRANT OF PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILD."

{¶ 50} According to K.B., she "demonstrated her commitment to her child: she was alcohol and drug free, she had no diagnosed mental health issues, she obtained and maintained employment, she had been in counseling for over a year and was doing well, she had independent housing." She further asserts that while reunification may not have been appropriate at the time of the hearing, "she had a concrete, reasonable plan to achieve reunification, * * * [and] [i]t was in the child's best interest that mother be given a chance to

prove that she could complete her plan."

{¶ 51}  As this Court has previously noted:

The Revised Code authorizes a trial court to terminate parental rights and grant permanent custody to the State upon a finding, by clear and convincing evidence, that permanent custody is in a child's best interest and that the child has been in the State's custody for at least twelve of the preceding twenty-two months.  R.C. 2151.414(B)(1)(d).  Alternatively, a trial court is authorized to grant permanent custody to the State if it finds, by clear and convincing evidence, that permanent custody is in the child's best interest and that the child cannot be placed with a parent within a reasonable period of time or should not be placed with either parent.  R.C. 2151.414(B)(2).

When considering a motion for permanent custody, a trial court must apply R.C. 2151.414(E), which identifies factors for determining whether a child cannot or should not be placed with either parent within a reasonable time.  If a court finds, by clear and convincing evidence, that any one of the R.C. 2151.414(E) factors exists, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." * * *.  *In re H.T. & Z.T.,* 2d Dist. Greene Nos. 10-CA-29, 10-CA-30, 2011-Ohio-1285, ¶ 22-23.

{¶ 52}  R.C. 2151.414(E) sets forth the following as a factor justifying such a finding:

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

{¶ 53} The trial court must also apply R.C. 2151.414(D), which provides a non-exclusive list of "best interest" factors, including the child's relationships with her parents and siblings, other relatives, and her foster family; the wishes of the child; her custodial history; the child's need for a legally secure, permanent placement and whether that may be achieved with or without a grant of permanent custody to the Agency.

{¶ 54} As this Court has previously noted:

A reviewing court must affirm a trial court's decision regarding permanent custody unless it is unsupported by clear and convincing evidence, a level of proof that produces a firm belief as to the facts sought to be established. * * * A trial court's "decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." * * * . *In re H.T. & Z.T.*, ¶ 24.

{¶ 55} Having thoroughly reviewed the record, we find competent, credible evidence from which the trial court could have determined that the statutory elements for termination of K.B.'s parental rights were established. The trial court's finding that K.B.

demonstrated a lack of commitment to K.B.F. is supported by the transcript of the March 17, 2011 hearing, and the record supports a finding that it is in K.B.F.'s best interest to grant permanent custody to the Agency. While under Agency supervision, K.B. failed to comply with her case plan, resulting in the grant of temporary custody to the Agency in December, 2008. Temporary custody was then twice extended due to K.B.'s continued failure to comply with her case plan objectives. In October, 2010, the Agency sought permanent custody, and Thompson detailed K.B.'s lack of compliance with her case plan at the permanent custody hearing. From July, 2009 until December, 2010, K.B. missed almost half of her visits with K.B.F. K.B. did not enroll K.B.F. in a domestic violence program, she herself delayed attending the program at Artemis, and she was discharged from PATH for noncompliance. Notwithstanding Cox's favorable testimony about K.B.'s commitment to her therapy, K.B. had not yet completed her parenting program at the time of the hearing. She further did not have independent housing and utilities but instead was relying on Rachel for help with expenses, contrary to her case plan. She stated that she had not "quite figured out" the sleeping arrangements at the apartment if her children were returned to her. Despite K.B.F.'s diagnosis of asthma, Thompson stated that K.B.'s apartment smelled strongly of tobacco. Prior to moving into her apartment, K.B. lived in multiple residences, and she acknowledged having been previously evicted in 2008. While K.B. testified that she had been employed at Flamingo's strip club since February, 2010, she admitted that she "lied about it" to her case worker. While K.B. had recently become more consistent with her visitation, her lengthy failure to properly address that objective with timely consistent visits, her admitted failure to take the issue of K.B.F.'s custody seriously, her failure to

maintain adequate housing, and her failure to complete parenting classes undermine her assertion that she is fully committed to her child. The record supports a conclusion that K.B.'s behavior establishes an inability to provide an adequate, permanent home for K.B.F.

{¶ 56} Regarding K.B.F.'s best interest, Thompson's testimony revealed that while K.B.F. and K.B. are bonded, the child is very integrated into the home of her foster family, and K.B.F. refers to her foster mother as "mom." Since she has been in her current home, K.B.F.'s negative behaviors have drastically improved, and she is thriving. Thompson stated that K.B.F.'s therapy has been successful, and the frequency of therapeutic sessions has been reduced. The G.A.L. reported, as the trial court noted, that K.B.F. most recently expressed a wish to remain with her foster mother. K.B.F. has been in Agency custody for more than twelve months of a consecutive twenty-two-month period. K.B.F. needs a legally secure permanent placement, and that type of placement clearly cannot be achieved without a grant of permanent custody to the Agency. K.B.'s assertion that she should have been granted more time to regain custody "overlooks the importance of [K.B.F.'s] right to [a] 'stable, secure, nurturing and permanent home in the near term.' * * *." *In re S.K., S.K. & J.K.*, 2d Dist. Clark Nos. 2008 CA 67, 2008 CA 68, 2008 CA 69, 2009-Ohio-427, ¶ 15.

{¶ 57} Since the trial court correctly determined that K.B. demonstrated a lack of commitment to K.B.F., such that K.B.F. cannot be placed with K.B., and since the grant of permanent custody of the child to the Agency is in K.B.F.'s best interest, K.B.'s first and second assigned errors are overruled.

{¶ 58} K.B.'s third assigned error is as follows:

"THE TRIAL COURT ERRED IN FINDING THAT THE AGENCY HAD MADE

REASONABLE EFFORTS TO REUNITE THE CHILD WITH THE MOTHER."

{¶ 59}   According to K.B., "the Agency not only failed to prevent the removal of the child, but in some ways actively prevented the mother from visiting with her child or allowing her to participate in the child's counseling.   The Agency made almost no effort at all towards reunifying the child with mother."

{¶ 60}   Thompson testified that K.B.F. became upset for days at a time when K.B. failed to attend visitation, and that the Agency instituted the cancellation policy as a direct result of K.B.'s inconsistency, to ensure that K.B. was in attendance prior to the transport of K.B.F. to the Agency.   Had she appeared on time, K.B. would not have been prevented from visiting her daughter.   Further, while K.B.'s participation in K.B.F.'s therapy was an objective of her case plan, Thompson stated that the child's therapist did not approve of her participation as a direct result of her inconsistent visitation.   In other words, K.B. herself is responsible for being denied visitation and participation in K.B.F.'s therapy.   Finally, reunification of K.B. and K.B.F. was the Agency's goal from the beginning, and K.B. received numerous referrals for domestic violence counseling, parenting skills counseling, and assistance with finding stable employment, all to help her achieve reunification.   K.B. either ignored the referrals or was dilatory in pursuing them.   Since the Agency made reasonable and diligent efforts to reunite K.B.F. and K.B., her third assigned error is overruled.

{¶ 61}   Having overruled K.B.'s assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . .

GRADY, P.J. and HALL, J., concur.

Copies mailed to:

Michele D. Phipps
Gary C. Schaengold
Hon. Anthony Capizzi