[Cite as *In re T.J.*, 2012-Ohio-3399.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

IN THE MATTER OF: T.J.                    :

                                          :          C.A. CASE NO.    25022

                                          :          T.C. NO.    JC 2008-4382

                                          :          (Civil appeal from Common
                                                      Pleas     Court,     Juvenile
Division)

                                          :

                                          :

. . . . . . . . . .

**O P I N I O N**

Rendered on the _____27th_____ day of _____July_____, 2012.

. . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee State of Ohio

ANN M. CURRIER, Atty. Reg. No. 0082305, 4 W. Main Street, Suite 723, Springfield, Ohio 45502
        Attorney for Defendant-Appellant Mother

. . . . . . . . . .

DONOVAN, J.

{¶ 1}    This matter is before the court on the Notice of Appeal of T.J.'s Mother

("Mother") filed February 3, 2012.  Mother appeals from the January 12, 2012 decision of the juvenile court which overruled her objections and the general objections of Maternal Grandmother ("Grandmother").  The objections were made to a July 30, 2010 decision of the Magistrate granting permanent custody of Mother's son, T.J., to the Montgomery County Department of Job and Family Services - Children Services Division. ("MCCS" or "Agency").  Upon review of the record, we conclude that the trial court possessed sufficient clear and convincing evidence from which to support a permanent custody award to the Agency.

{¶ 2}    T.J. was born October 14, 2007 and was medically fragile at birth.  He was unable to keep formula down and was diagnosed with severe reflux and failure to thrive. T.J. and Mother were living with Grandmother at her home along with several other family members, specifically, Mother's brother and sister, and three of Grandmother's grandchildren.  After multiple hospitalizations in his early months, T.J. underwent a fundoplication surgery and a gastrostomy to prevent reflux.  Initially, T.J. was fed by a tube through his nose but because he kept pulling it out, he was later implanted with a G-Tube for feeding and nutrition.  He required nighttime feedings to meet his nutritional needs.

{¶ 3}    In May of 2008 T.J. was admitted to the hospital on several occasions. After a May 1st hospitalization, Grandmother was given care of T.J..  She was instructed on how to feed T.J. and was also educated about his medical needs.  A few weeks later, MCCS nurses visited T.J. and found him "dehydrated, listless and lethargic."  The nurses instructed Grandmother to take T.J. to the hospital to obtain for him a specific high caloric formula. At this time T.J. was significantly below the fifth percentile on the growth chart and weighed

ten pounds and six ounces, well below an ideal weight of sixteen pounds.

{¶ 4} Thereafter, on May 16, 2008, MCCS filed a Complaint for Neglect and Dependency of minor child T.J. Interim Temporary Custody was granted the same day to the Agency. The complaint identifies the father of T.J. as S.J. and indicates that his address is unknown. The father has neither come forward nor expressed an interest in custody. On May 20, 2008 the court appointed a Guardian ad Litem ("G.A.L.") for T.J. and after conducting a hearing on May 22, 2008, the magistrate found that it was in the best interest of T.J. for interim temporary custody to remain with the Agency. That same day the court appointed a G.A.L. for Mother.

{¶ 5} The magistrate issued an order of adjudication, finding T.J. dependent on July 30, 2008. The court found, and the parties agreed that the child should be placed in Grandmother's temporary custody pending completion of a home study. However, Mother was not to have any unsupervised contact with T.J. Thereafter, the record establishes that Grandmother failed the home study. On January 27, 2009, the magistrate issued a decision and order granting temporary custody back to MCCS. At this time the magistrate approved an updated case plan in accordance with R.C. §2151.353(D). During this period of temporary custody to the Agency, extended visitations were attempted at Grandmother's home on four weekends between May-June of 2009. The record establishes that even though these were not overnight visits, T.J. lost weight each weekend. These visits were discontinued and visitations returned to a couple days a week for five hours. MCCS filed for Permanent Custody on September 1, 2009. An attached affidavit of Kamesha Johnson noted that MCCS has not approved a home study on Grandmother because of her history

with the agency, the number of people living in her residence, hazards at the residence, and Grandmother's failure to consistently attend T.J.'s medical appointments. It also noted that "Grandmother is almost always late to the appointments for T.J.*** [and] has also missed eight appointments while T.J. was in her care."

{¶ 6} On March 22, 23, and May 6, 2010 a trial was held before the Magistrate on the Agency's request for permanent custody. The Magistrate issued a Decision and Magistrate's Order Granting the Motion for Permanent Custody on July 30, 2010. The magistrate found that T.J. cannot be placed with either parent in the foreseeable future and that permanent custody to the Agency is in T.J.'s best interest.

{¶ 7} Mother and Grandmother filed objections to this decision and order on August 11, 2010, and then supplemented the objections after receipt of the transcript on April 26, 2011. MCCS responded on June 20, 2011. The objections relate to the following magistrate's conclusions: Mother and Grandmother failed to remedy the conditions causing T.J.'s removal; a lack of commitment to T.J. was demonstrated; there are no ready, willing, and able relatives to assume custody; and that permanent custody to the Agency is in the best interests of T.J. On January 12, 2012, the Juvenile Court overruled the objections and adopted the magistrate's decision awarding permanent custody to the agency pursuant to R.C. § 2151.414. It is from this judgment that Mother now appeals.

{¶ 8} Mother's first assignment of error is as follows:

THE TRIAL COURT ERRED BY GRANTING THE MOTION FOR

PERMANENT CUSTODY TO MCCS WHEN MCCS FAILED TO SHOW,

BY CLEAR AND CONVINCING EVIDENCE, THAT T.J. SHOULD NOT

OR COULD NOT BE PLACED WITH MOTHER WITHIN A REASONABLE AMOUNT OF TIME.

{¶ 9} Mother contends that the court should not have granted permanent custody to the Agency because she substantially completed her case plan objectives and, therefore, remedied the conditions that caused the initial removal of T.J. from the home. Mother also asserts that clear and convincing evidence does not establish that her mental illness is an impediment to placement with her within one year. Finally, she asserts that MCCS has failed to prove that she has demonstrated a lack of commitment to the child. We disagree.

{¶ 10} We have held that the law governing the termination of parental rights is as follows:

The Revised Code authorizes a trial court to terminate parental rights and grant permanent custody to the State upon a finding, by clear and convincing evidence, that permanent custody is in a child's best interest and that the child has been in the State's custody for at least twelve of the preceding twenty-two months. R.C. 2151.414(B)(1)(d). Alternatively, a trial court is authorized to grant permanent custody to the State if it finds, by clear and convincing evidence, that permanent custody is in the child's best interest and that the child cannot be placed with a parent within a reasonable period of time or should not be placed with either parent. R.C. 2151.414(B)(2).

When considering a motion for permanent custody, a trial court must apply R.C. 2151.414(E), which identifies factors for determining whether a

child cannot or should not be placed with either parent within a reasonable time. If a court finds, by clear and convincing evidence, that any one of the R.C. 2151.414(E) factors exist, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."***. *In re H.T. & Z.T.*, 2d Dist. Greene Nos. 10-CA-29, 10-CA-30, 2011-Ohio-1285, ¶22-23; *In re K.B.F.*, 2d Dist. Montgomery No. 24891, 2012-Ohio-1855, ¶ 51.

The trial court found by clear and convincing evidence that §2151.414(E)(1),(2) and (4) were satisfied.

### A. §2151.414(E)(1)

{¶ 11} R.C. 2151.414(E)(1) directs the court to consider whether: *the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home* * * *The court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available.*

{¶ 12} The conditions that warranted the removal of the child were noted in an affidavit of Gloria A. Washington attached to the initial complaint for temporary custody. The affidavit indicates, that "it was discovered that the special formula that the child was prescribed ran out and Maternal Grandmother did not request additional formula from anyone, but instead began feeding the child from a different formula and water. This resulted in the child having diarrhea and making the weight situation worse."

{¶ 13} It is undisputed that T.J. is medically fragile, failed to thrive and lost weight

since May 1, 2008. MCCS had legitimate concerns about the home environment and the number of people living at Mother and Grandmother's residence and the cigarette smoking in the household. At the permanent custody hearing, MCCS caseworker Kamesha Johnson testified on the subject of Mother and Grandmother's case plans and the goal of reunification. Mother's case plan was "to have a Crisis Care assessment and follow any and all recommendations. Mom is to engage in ongoing mental health services. Mom is to visit with [T.J.], and also to have parenting classes." These goals were not fully achieved.

{¶ 14}    As to Grandmother's ability to care for T.J., Rosemary Carr, an MCCS nurse testified that while T.J. was in foster care he "was making a straight line up the growth chart" but when he was placed with Grandmother "he made a very slow progression* * * because [his growth] was going up and down and up and down." Further, she stated that in spite of her repeated suggestion for Grandmother to get T.J. on a feeding schedule, Grandmother failed to do so.

{¶ 15}    Additional evidence of Mother and Grandmother's failure to remedy the conditions requiring T.J.'s removal are established by T.J's G.A.L., Richard Smith's testimony which noted  T.J.'s weight issues while in Grandmother's care. As G.A.L., Smith collected and plotted T.J.'s weights and measurements from the GI appointments along with the MCCS nurses. Smith was able to keep a record of T.J.'s progress as well as who was caring for him when the measurements were taken. Smith testified that during the four months T.J. was returned to Grandmother and Mother "he fell further off the growth charts." As to the attempts at reunification, Smith noted that the Court attempted extended visits during the four weekends in May-June 2009. Smith emphasized that during the

weekdays in foster care, T.J. showed steady weight gain whereas during the four weekend visits with Mother and Grandmother, T.J. showed a steady loss in weight.

{¶ 16}     The caseworker, Ms. Johnson, testified that the home study failed in part because "T.J. will be sharing a room with [Grandmother].  And any child over the age of one cannot share a room with an adult.  Also, another reason that the home failed is that there was more people–there was too many people in the home."  At the hearing, Grandmother testified that several family members moved out the week before the trial. But Johnson's "primary concern was for the failed home study was because of the Children Services past history with Grandmother."  Grandmother's history with the Agency occurred ten years earlier, but according to Johnson the Agency policy is that whenever an abuse or neglect   case is substantiated, it must be considered in placing a child in that person's home.  The history did include substantiated abuse and neglect.

{¶ 17}     The court adopted the magistrate's decision which held that Mother did not make satisfactory progress on her case plan and that although Mother initially attended the crisis care assessment and attempted to engage in mental health counseling and visits with the child, she had not been fully compliant with her mental health care and has repeatedly refused to attend parenting classes.  It was emphasized that Mother received the parenting schedule at Charles Drew Health Center in 2009, and again in February of 2010, but that Mother refused to go because she does not want T.J. for herself but wished for T.J. to be placed with Grandmother.

{¶ 18}     Accordingly, an analysis of §2151.414(E)(1) supports a finding in favor of the agency.

## B. §2151.414(E)(2)

**{¶ 19}** §2151.414(E)(2) requires the court to consider whether a parent's mental illness is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time or within one year after the court holds a permanent custody hearing. Mother had been diagnosed with Bi-Polar Disorder as well as anger and substance abuse issues. She stopped taking her medication (Lithium) during pregnancy and did not resume until she began the case plan. Ms. Johnson testified that Mother began compliance with her Crisis Care assessment but due to lack of compliance was discharged from the mental health provider. At the time of the hearing she was not seeing a mental health counselor in accordance with Agency directives. The court found clear and convincing evidence to support a conclusion that Mother could not provide an adequate permanent home for the child within one year due to her ongoing mental illness.

## C. §2151.414(E)(4)

**{¶ 20}** In addressing §2151.414(E)(4),the court considered whether*: The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.* The court acknowledged that Mother visited the child and wished for continued visitation, but that it was evident that Mother was no longer interested in custody of the child for herself. The feeding specialist and PACE worker both testified that when Mother attended the appointments she never worked with T.J., instead Grandmother did. Furthermore, the Court credited the G.A.L.'s opinion that placement with Mother is not possible in the foreseeable

future and that the Mother has demonstrated a lack of commitment toward the child by abdicating all parental duties to her mother. Although interaction between T.J. and Mother was appropriate, Mother's actions were "not always as you would expect a mother to, because I think she's sort of relinquished that role to her mother."

{¶ 21}    Thus, we find that the there was competent and credible evidence to support the trial court's conclusion that Mother had abdicated her interest in attaining custody of T.J.    The first assignment of error is overruled.

{¶ 22}    Mother's second assigned error is as follows:

THE TRIAL COURT ERRED BY GRANTING THE MOTION FOR

PERMANENT CUSTODY TO MCCS WHEN MCCS FAILED TO SHOW,

BY CLEAR AND CONVINCING EVIDENCE, THAT IT WAS IN T.J.'S

BEST INTEREST FOR PERMANENT CUSTODY TO BE GRANTED.

{¶ 23}    Mother contends that T.J.'s actions and her testimony establish that T.J.'s wishes are for custody to be with his biological family and that the final (D)(1) "best interest" factor about alternative placements should have resulted in Grandmother receiving custody.    Appellant contends that Grandmother is a viable custodian because she remedied the failed home study concerns and substantially complied with the case plan objectives. Mother asserts that the testimony on T.J.'s weight loss was not sufficient to show by clear and convincing evidence that it was caused by the visitations to Grandmother, and lastly that Grandmother's unemployment and lack of income did not matter because Caresource aid would be available to the family.

{¶ 24}    The trial court must   apply R.C. 2151.414(D), which list the non-exclusive

"best interest" factors to consider in granting permanent custody. The factors include: (a) the interaction and interrelationship of the child with the biological family, foster family, and any other person who may significantly affect the child; (b) the wishes of the child as expressed directly or through the G.A.L. with due regard for the maturity of the child; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the Agency; and (e) whether any of the factors listed in (E)(7) to (11) apply to the parents and the child.

{¶ 25} "A reviewing court must affirm a trial court's decision regarding permanent custody unless it is unsupported by clear and convincing evidence, a level of proof that produces a firm belief as to the facts sought to be established." In re H.T. & Z.T., supra, ¶ 24. If the juvenile court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," an appellate court may not reverse the judgment. *In re A.S.*, 2d Dist. Montgomery No. 22269, 2007-Ohio-6897, ¶15, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990).

{¶ 26} As we have previously held, "'courts do not have to first consider placing children with relatives before they may award permanent custody to a children services agency'* * *Instead, the trial court must determine what placement would be in the best interest of the child." *In re A.U.*, 2d Dist. Montgomery Nos. 20583, 20585, 2004-Ohio-6219, citing *In re Amanda Williams*, 2d Dist. Montgomery No.18217, 2000 WL 1299540, *3 (Sept. 15, 2000). *In re A.U.* involved an appeal requesting custody to a grandmother. The Court held that the she was not a suitable custodian because she

repeatedly failed the home study, did not complete the case plan, and was not financially able to support the child. *Id*. at ¶ 36. After determining the mother was not appropriate and neither were other relatives, the court ruled that the trial court considered all aspects of the child's life and relationships when determining permanent custody and that ultimately the record, by clear and convincing evidence, showed that the best interest of the child was not served by placement with the relative, but instead the best interest of the child dictated permanent custody to the Agency. *Id*. at ¶ 38.

{¶ 27} Herein, the trial court concluded that factors (a), (b) and (e) do not favor either position. First, the testimony has shown a bond and connection between both the biological family and the foster family. T.J. has bonded with Mother and Grandmother but more so with the latter, and also a strong bond existed with the foster family, including calling the foster mother "Nana." Secondly, although T.J.'s G.A.L. expressed his preference for permanent custody to the Agency, this factor does not favor either position because at the time of the hearing T.J. was two years of age and too young to express his wishes. Lastly, the court concluded that the factors (E)(7) to (11) do not apply to this case.

{¶ 28} Whereas factors (a), (b) and (e) did not favor either position, the court found by clear and convincing evidence that factors (c) and (d) strongly favored a permanent custody award to the Agency. Like *In re A.U.,* the court considered all aspects of the child's life and relationships as well as possible placement with Grandmother. The custodial history of T.J. as well as his need for a legally secure permanent placement support the court's conclusion that T.J.'s best interest is served by an award of custody to the Agency.

{¶ 29}    As to the custodial history of T.J., the court noted that T.J. has been in foster care or under MCCS supervision the majority of his life.  At the time of the hearing, ten of the past fifteen months were in Agency care.  After the first award of temporary custody of T.J. to the Agency in May of 2008 he was returned to Grandmother's care in August or September of 2009, and then returned to Agency custody in January of 2010, where he has remained ever since.  Djuan Malone from the Parent and Child Enrichment program (PACE) has been working with T.J. since July 2008.  She noted that T.J. was attending PACE for his "global delays" and provision of "gross motor skills, cognitive skills, language, fine motor skills ***[and] social-emotional."    Malone testified that T.J. has shown significant improvement.  While in foster care, she noted that at ten months T.J. was not crawling but has since shown improvement and is now able to walk and run.

{¶ 30}    Rosie Owens, the Health Services supervisor at MCCS, testified as to her involvement with T.J. since May of 2008.  In May of 2008, Owens was one of the nurses who suggested that Grandmother take T.J. to the hospital because he "was small, lethargic, [and] had some drainage from the tube."  As supervisor, Owens was involved with the extended visitation attempt with Grandmother in May-June of 2009. Owens weighed T.J. before he went to Grandmother's on Fridays and then after each visit on Mondays.  Owens noted that T.J. gained steadily during the week days but that "he had a [weight]loss every weekend from that Friday evening to that Monday evening."  The feeding requirements at that time were for T.J. to consume 4-6 ounces of food orally but if he failed to do so, then he was to have a bolus feed directly through his G-Tube site. Owens testified that Grandmother told her that T.J. was taking the food orally but it was her opinion that the weight loss during

this period was not consistent with the amount of food T.J. should have been receiving. The weekend visits ended because of T.J.'s weight loss and the difficulty of continuously transporting T.J. between the homes. This evidence supports the finding that the best interest of T.J. is served by an award of permanent custody to the Agency.

{¶ 31} As to R.C. 2151.414(D)(1)(d) and T.J.'s need for a legally secure permanent placement and whether that can be achieved with or without permanent placement to the Agency, the court concluded that T.J. is in desperate need of a legally secure placement which supports Agency custody. In addition to possible placement with Mother, the court also considered Grandmother and any other potential relative for placement.

{¶ 32} As to other alternative placements, Johnson testified that it was not until March of 2010 that the maternal aunt requested a home study. She was purportedly unable to request one earlier because she was living with Grandmother. She had allegedly moved out right before the hearing. On these facts, the aunt was not a viable placement for T.J.

{¶ 33} Clearly the court did fully consider potential placement with Grandmother. The court found that the testimony at the hearing established that Grandmother had made steps to complete her case plan, but continuously missed medical appointments. Furthermore, T.J. displayed a more consistent growth pattern while in foster care. The court found that Grandmother did not adequately complete her case plan objectives, and did not demonstrate an ability and willingness to appropriately address T.J.'s medical needs. At the time of hearing Grandmother was unemployed and her income could not be documented. Grandmother missed four of six appointments to address T.J.'s nutritional needs and was

late to a fifth just before the final hearing on May 6, 2010.

{¶ 34}   We find competent, credible evidence from which the trial court properly concluded that the statutory elements for termination of parental rights were established. The trial court held that although the Mother began mental health counseling she was terminated from the program and forced to restart.   Furthermore, the testimony of Johnson establishes that Mother refused to attend parenting classes as required by her case plan. Mother has also abdicated her interest in attaining custody and instead wishes for Grandmother to have custody of T.J..   Furthermore, the testimony from the hearing, evidences a lack of commitment of Mother to participate in a case plan and attend appointments.   Although T.J. exhibited a bond with Grandmother, the Court correctly found that custody with Grandmother was also not suitable because she demonstrated a lack of commitment to attend appointments, neglected to remedy the failed housing study concerns until the week before trial, and had eight   prior substantiated abuse claims with MCCS.

{¶ 35}   Clear and convincing evidence establishes that the factors set forth in R.C. 2151.414(D) support a finding of Agency permanent placement for T.J.   Competent credible evidence also supports the determination that T.J. could not be placed with either parent in a reasonable period of time as set forth in R.C. 2151.414(B).   Like the petitioning relative in *In re A.U.*, Grandmother did not complete her case plan, continuously missed appointments, and repeatedly failed to remedy the circumstances that failed the home study. Mother argues that T.J.'s wishes are reflected in his bond with her and Grandmother. Although there is evidence of a bond with the biological family, there is also repeated testimony from the nurses, G.A.L., and caseworker that T.J. was likewise bonded to the

foster family. As noted by the trial court, this factor under best interest considerations in R.C. 2151.414 does not favor either side. Thus, the trial court based its decision upon the other factors, including the custody history of T.J. and his need for a legally secure permanent placement.

{¶ 36} The court correctly found that the Agency made reasonable efforts to prevent T.J.'s removal and work towards reunification but permanent custody to MCCS is in the best interest of the child pursuant to §2151.414(D)(1). The court correctly held that placement with the parents is not possible in the reasonable future under §2151.414(E) because the father has not come forward and has expressed no interest in custody and Mother has failed to complete her case plan objectives. We conclude that the trial court considered all aspects of the child's life, relationships, and permanent custody needs when determining what would be in T.J.'s best interest. Competent and credible evidence establishes that T.J. cannot be placed with Mother within a reasonable time, and Grandmother is not a suitable alternative. Thus, the permanent custody award to the Agency is in T.J.'s best interest. Mother's second assignment of error is overruled.

{¶ 37} Having overruled both of Mother's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Michele D. Phipps
Ann M. Currier
Hon. Nick Kuntz