[Cite as *In re D.H.*, 2012-Ohio-4619.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

IN RE: D.H., D.H., D.W., JR., and D.W.    :

    :        C.A. CASE NO.    25159

    :        T.C. NO.    JC1999-1652
                        JC2000-0863
    :                 JC2006-10852
                        JC2006-10874

    :

        (Civil appeal from Common
    :        Pleas Court, Juvenile Division)

    :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    5th    day of    October   , 2012.

. . . . . . . . . .

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

HILARY LERMAN, Atty. Reg. No. 0029975, 249 Wyoming Street, Dayton, Ohio 45409
      Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}    This matter is before the Court on the Notice of Appeal of D.H.1 ("Mother"),

filed April 5, 2012. Mother appeals from the trial court's March 9, 2012 judgment granting permanent custody of her four children to Montgomery County Children Services ("MCCS"). We hereby affirm the judgment of the trial court.

{¶ 2} Mother's children are D.H.2 (D.O.B. April 6, 1998), D.H.3 (D.O.B. February 5, 2000), D.W.2 (D.O.B .July 18, 2005), and D.W.3 (D.O.B. October 16, 2006). The record reflects that D.H.2 was adjudicated dependent on June 30, 1999; D.H.3 was adjudicated dependent April 25, 2000; and D.W.2 and D.W.3 were adjudicated dependent on January 10, 2007.

{¶ 3} On May 25, 2007, MCCS filed motions for temporary custody or alternatively temporary custody to a relative for all four children. The juvenile court granted temporary custody to C.J., Mother's maternal great aunt, on August 30, 2007 and granted an extension of temporary custody to C.J. on May 12, 2008.

{¶ 4} On October 9, 2008, MCCS moved the court for another extension of temporary custody. An attached affidavit provides in part as follows: "The Maternal Great Aunt has indicated that she is no longer able to have the children reside in her home and has requested their removal. Father, [M.H.], of D.H.2 is currently incarcerated at the Dayton Correction Institute for convictions for Drug Trafficking and Possession. Father, [D.W.1] of [D.W.2 and D.W.3] has not been involved with MCCS * * *." On January 12, 2009, Mother filed a motion requesting legal custody with supervision by MCCS. On February 25, 2009, the court-appointed Guardian ad Litem ("G.A.L.") filed a report recommending that MCCS "should be granted a second extension of temporary custody for all the four children." The report provides in part as follows:

The children, [D.H.3, D.W.2, and D.W.3] are living with the maternal aunt, who has temporary custody of them. [D.H.2] was recently placed into a new foster home due to the fact that the aunt said she could no longer care for him because of his disruptive behavior. [D.H.2] disclosed sexual abuse allegation (sic) last October, that took place when he was residing with mother. [D.H.2] has been taken to Care House. The alleged perpetrator is [D.W.1], the father of [D.W.2 and D.W.3]. * * * There is concern that mother is not taking these allegations serious. According to [MCCS] the aunt and the agency have agreed that the children should come into foster care.

On March 9, 2009, the court granted MCCS's motion, giving the Agency temporary custody until May 25, 2009.

{¶ 5}    On April 30, 2009, MCCS filed a motion for permanent custody, and on August 6, 2009, Mother filed a motion for custody with supervision by MCCS. On November 9, 2009, the G.A.L. filed a report recommending that MCCS's motion for permanent custody be granted. On July 7, 2010, after a hearing in February, 2010, the Magistrate granted MCCS's motion for permanent custody.

{¶ 6}    On July 15, 2010, Mother filed objections to the Magistrate's decision, and she filed supplemental objections on July 29, 2011. According to Mother, the Magistrate erred in determining that the children could not be returned to her within a reasonable period of time, and the Magistrate's decision was against the manifest weight of the evidence and not in the children's best interest. On March 9, 2012, the trial court overruled Mother's objections. The court rejected Mother's assertion that the Magistrate placed greater weight

on Mother's disbelief that D.W.1 abused D.H.2 and D.H.3 than on the other factors set forth in R.C. 2151.414, as well as her assertion that she completed or substantially completed all of her case plan objectives.

{¶ 7}     The court determined that at the time the motion for permanent custody was filed, the children had not been in the temporary custody of MCCS for a twelve month period, and the court prodeeded to analyze whether the children could be placed with Mother within a reasonable time.   According to the court, in reliance upon the factors listed in R.C. 2151.414(E)(1) and (4), Mother failed continuously and repeatedly to substantially remedy the conditions that caused the children to be removed from her home, and she demonstrated a lack of commitment to the children by failing to regularly support, visit, or communicate with them.

{¶ 8}   At the permanent custody hearing, Dr. Rahem Rodgers testified that she is a clinical psychologist employed at Antoinette Cordell and Associates, and that she completed a psychological evaluation and parenting assessment of Mother during February and March, 2009.   Rodgers stated that she met with Mother five times in the course of the evaluation, and that Mother was punctual.   Rodgers administered an MMPI-II, which is a true/false test designed to measure "potential psychological problems that a person may be experiencing." She stated that the results indicated that Mother "tends to be a thrill seeker," and "non-conforming to society rules," which "could cause problems in her day-to-day life." Rodgers stated that she administered a sentence completion test to Mother that is also designed to measure potential psychological problems as well as Mother's "predominant concerns."   Rodgers testified that the results indicated that Mother "did focus on wishing for

reunification for her children" and exhibited "some regret for decisions in her past."

{¶ 9} Rodgers testified that she personally interviewed Mother, and she noted that during that phase of the evaluation, Mother was "rather guarded, and not very free with offering information about herself." Rodgers stated that later, "during consultation," Mother indicated to her that "she was benefitting from her therapy and she was starting to see that she did have problems that she would like to address. And they were in the realm of depressive issues." Rodgers stated that she diagnosed Mother, to a reasonable degree of medical and scientific certainty, with a major depressive disorder, and that the disorder caused irritability and difficulty with social relationships. According to Rodgers, Mother was "having difficulty maintaining employment due to her way of interacting with the public."

{¶ 10} Regarding the parenting assessment, Rodgers testified that Mother indicated that "she was not as engaged and bonded with the children" and wanted to "work on getting to know them better." As part of the assessment, Rodgers stated that she conducted an observation of one of Mother's visits with the children. She noted "that she seemed to discipline adequately, but she was not as in tune with the children's emotional needs, specifically, when I observed, in the oldest two boys, in their attempts to engage her sometimes, she did not reciprocate that." When asked to identify Mother's "parenting deficits," Rodgers responded, the "most major was her bonding with the children and ability to meet their emotional needs."

{¶ 11} Rodgers stated that, due to the allegations of sexual abuse, MCCS specifically asked her to address whether Mother would be able to protect the children from potential abuse in the future, and she testified that Mother's "history indicated that when she

was in a relationship, she was more focused on the relationship than the children." When asked if she discussed the allegations of sexual abuse with Mother, Rodgers replied that Mother "indicated that she was not sure if she believed it," and that Mother thought perhaps her aunt was responsible for the allegations, in an effort to prevent her from regaining custody of the children. Rodgers stated that due to Mother's disbelief, "she's less likely to follow through with what the children need to be able to deal with that in any effective and healthy way," and "less likely to provide the adequate support that they need * * * in healing from that." Rodgers further stated that not recognizing the potential threat to her children may lead Mother to "place them in harm's way again."

{¶ 12} Rodgers testified that she recommended that prior to reunification, Mother "needed to make good progress in individual and family therapy, and the progress would have to be determined by the therapist that she was engaged with as to was she actually doing better or getting better." Rodgers recommended family therapy with the older boys, as well as anger management therapy. Rodgers stated that Mother was receptive to her recommendations.

{¶ 13} On cross-examination, Rodgers stated that she determined that Mother did not have a relationship with her own mother as a child, and that she had been raised by her father and grandmother. Rodgers stated that at the time of the evaluation, the children were residing with Mother's aunt and grandmother, and Mother indicated that there were "problems" between her and them. Rodgers acknowledged that Mother's limited, weekly, visitation with the children could have an impact on her ability to bond with them, and that not having custody of them, as well as the problematic relationships in her family, could

contribute to her depression. On redirect examination, Rodgers noted, regarding Mother's depression, "the fact that her mother was not a part of her life, and that her mother had given all of her children to their respective fathers," was a factor that caused Mother to "be unhealthy as a[n] adult." Rodgers further noted that although Mother's relationship with D.W.1 was over, "whatever occurred between them could have also contributed to her being unhealthy."

{¶ 14} Betty Gilbert testified that she is a therapist at Day-Mont Behavioral Health Care Center, and that she began providing counseling for Mother in January, 2008. Gilbert stated that she met with Mother once a week for an hour, and she addressed Mother's low self esteem, "[a]nger issues, depression, and her case pending with [MCCS]." According to Gilbert, Mother's attendance was initially not consistent, but that later "she began to feel comfortable with me and feel that she could open up and talk with me." Gilbert stated that Mother's participation was consistent from the end of March, 2008 until November, 2009. Gilbert stated that she recommended a "Wellness Management Recovery" ("WMR") program for Mother, and an anger management group. Gilbert stated that Mother "acknowledged that her anger is a big problem in her life because she's been angry for so long." Gilbert stated that Mother had been fired from a job because of her anger. She testified that Mother only attended the WMR program and anger management group once because "she didn't have an income, and she said she had trouble getting there."

{¶ 15} According to Gilbert, regarding the allegations of sexual abuse, Mother "expressed being confused," and felt "her kids was coerced into telling this event that happened. She didn't know what to believe. She felt like that she was incapable of making

the right decision, because she didn't believe that it had happened." Regarding D.W.1, Gilbert stated that Mother "was in love with this young man. And she wanted to believe that he wouldn't do that." Gilbert stated that Mother eventually "gained insight and realized that she knew her kids and believed in them." Gilbert stated that Mother later "had some remorse about not feeling that she could protect" her children. Gilbert stated that Mother advised her that she visited D.W.1 in November, 2009, while he was incarcerated. According to Gilbert, Mother "just wanted to see him and just to see what he had to say."

{¶ 16} Gilbert stated that Mother moved to Columbus in November, 2009, and that she kept two appointments after the move. At the last appointment, Gilbert stated that Mother "was excited because she had got her a place and a job in Columbus. And she was feeling pretty good about herself." Gilbert testified that Mother advised her that she planned to continue therapy in Columbus, and "she acknowledged that she needed it." Gilbert stated that Mother moved because she "felt that she needed to get in a different environment, because she felt that living here in Dayton there's too many memories and too many things that have happened to make her feel like she can prosper in her life. And she wanted to make a move so she can do better." Gilbert stated that she advised Mother to consider the timing of her move, and she stated that she "felt like [Mother] was running from her situation, because she was afraid and confused."

{¶ 17} According to Gilbert, Mother made progress in therapy and "was more open about her life and what she was doing. She was keeping her appointments. She was focusing more on what she needed to do to get her children back." Gilbert recommended that Mother remain in counseling and stated that she does not believe Mother successfully

completed her therapy. She stated that Mother's anger remains a concern, and that Mother has "a hard time trusting others."

{¶ 18} On cross-examination by the G.A.L., Gilbert stated that in October, 2009, Mother began to express remorse for failing to protect her children. On redirect examination, Gilbert stated that she first addressed the allegations of sexual abuse with Mother in early 2008, but that Mother "didn't want to talk about it."

{¶ 19} Carla Merritt, a caseworker at MCCS, testified that she took over Mother's case in April, 2009, and at that time the children were in foster care, having been removed from the care of C.J. She stated that Mother's case plan objectives were "to obtain and maintain stable housing and income. She is to complete a mental health assessment, and psychological evaluation and parenting assessment. And she is to visit with the children and provide names for alleged fathers." Merritt stated that she discussed the case plan objectives with Mother every time they met. She stated that when she took over the case, Mother was living in a one bedroom apartment, but "she was planning on moving to a bigger apartment once she got the children back." At that time, according to Merritt, Mother did not have a steady job, but she was "actively looking for employment."

{¶ 20} Regarding visitation, Merritt stated that Mother was consistent until she moved to Columbus. Merritt stated that Mother's weekly visitation with the children was for two hours a session, and that it was supervised "because the Agency was concerned with the nature of the conversations that mom was having with the children, specifically with the sexual abuse allegations." In August of 2009, Merritt testified that she learned that at one of the visits, when only D.H.3 was present, Mother asked him about the sexual abuse. When

D.H.3 related to her what had happened, Mother stated, "I don't believe you. [D.W.1] didn't do anything to you." Merritt testified that when she confronted her, Mother "said that she did not say that." Merritt stated that Mother was opposed to the supervision of her visitation.

{¶ 21} Merritt stated that when Mother advised her that she intended to move to Columbus, Mother "stated that she just wanted to leave. Too many bad memories in Dayton. She just wanted to leave everything behind." She stated that Mother obtained a job at KFC as well as subsidized housing in November, 2009, and that prior to that, she had maintained the same apartment in Dayton. She stated that Mother was unemployed from May, 2009, until she got the job in Columbus, having been previously fired from a job at Arby's. Merritt stated that Mother's current income is sufficient to meet the needs of herself and her children, and that she makes "a little over four hundred dollars for every two weeks." Merritt stated that Mother provided paperwork indicating that the Columbus Metropolitan Housing Authority would provide a larger home in the event Mother regained custody of the children. Merritt stated that she expressed concern to Mother about the impact of the move on her visitation and bond with the children. According to Merritt, Mother "said that she would still try" to attend her weekly visitation. Merritt testified that after the move, Mother visited the first two weeks in November, and then "she cancelled visits because she said that she could only get off once a month to visit." Her final visit was on December 23, 2009. Merritt stated that she visited Mother in Columbus on January 13, 2010, and discussed her failure to consistently visit the children.

{¶ 22} Regarding mental health counseling, Merritt stated that she requested

documentation from Gilbert regarding Mother's participation and progress but that she never received it. Merritt stated that Mother completed a recommended parenting class. According to Merritt, Mother indicated to her that she was not engaged in therapy in Columbus. Merritt testified that she does not consider the counseling objective to be satisfied. Merritt stated that she had not yet referred the children and Mother to family therapy.

{¶ 23} Merritt stated that in August, 2009, D.H.2 was hospitalized with meningitis, and in the course of a visit with him at the hospital, Mother asked him about the sexual abuse. According to Merritt, D.H.2 "told her what happened, and she said 'I don't believe you.'" Merritt testified that in the course of the conversation with D.H.2, Mother "caused a disturbance" and was removed from the hospital by security.

{¶ 24} Regarding the sexual abuse, Merritt testified that D.W.1 was accused of raping D.H.2 and D.H.3, and that when she took over the case, charges were pending against him. Merritt stated that when she discussed the issue with her, Mother stated that she was "confused," and that she thought "something might have happened when they were staying with their father. I think they saw something that may have made them act out the way that they did." Mother further indicated to Merritt, according to her testimony, that "she thought that her aunt was making up these allegations because she was getting close to being reunified with her children. And she also mentioned that she didn't understand why [D.W.1] would abuse the kids, because she was giving him enough sex, and he was cheating on her." According to Merritt, Mother told her that D.W.1 babysat for her cousins' children, and "if she talked to CARE House, she wanted to bring her cousins, because they could testify that [D.W.1] had not sexually abused any of their children." Merritt stated that Mother never

indicated to her that she believed that her children had been sexually abused.

{¶ 25} D.W.1's judgment entry of conviction, indicating that he entered two guilty pleas to rape by force, was admitted into evidence. Merritt stated that D.W.1 has objectives in the case plan, namely "to complete a psych and parenting assessment, substance abuse assessment, and follow the terms of his probation, but he was already incarcerated in another state." Merritt stated that she contacted D.W.1's mother, who informed her that he was serving a three year sentence in West Virginia, and that she did not want custody of her grandchildren. Merritt testified that M.H. was the alleged father of D.H.2, and that he has a case plan objective to establish paternity, and that T.B. was "ruled out" as a father for D.H.3.

{¶ 26} Regarding the children's special needs, Merritt testified that D.H.2 "was having some behavior problems in school. He was diagnosed with anxiety and post traumatic stress disorder." She stated that he sees a specialist once a month to treat his sickle cell anemia. Merritt stated that D.H.3 has ADHD.

{¶ 27} Merritt stated that D.W.2. and D.W.3 are in a foster-to-adopt home together, and that their foster parents have not indicated a desire to adopt them. She stated that D.H.2 and D.H.3 are in separate foster-to-adopt homes, and that D.H.2's foster parents do not want to adopt him, but they have indicated "that he can stay in the home as long as he wants." Merritt stated that D.H.3's foster parents want to adopt him. Merritt testified that MCCS considers all of the children to be "adoptable," and she believes it is in their best interest for MCCS to be granted custody, since "mom does not consistently believe that the children have been abused," and MCCS "is concerned whether or not she would be able to protect them from any future abuse."

**{¶ 28}** Karen Davis, a family support worker for MCCS, testified that she provided transportation for Mother to complete her psychological and parenting evaluations in February and March, 2009, because she had missed previous appointments, as well as transportation in the course of Mother's job search, during the months of May - July, 2009. Davis stated that she also supervised Mother's visitation along with Merritt. Davis testified that Mother lost benefits for her food stamps in the summer of 2009, as a three-month sanction, because "she did not do her work site," and that Davis subsequently "transported her to several different food pantries, the Good Neighbor house," and "called in [a] referral to Epiphany for food for her, delivered that." Davis stated that Mother advised her that the "work site that she was assigned to was * * * too far to go, and it was just stupid for her to have to go there, because part of the time they would send her back because there was no work for her to do." Davis stated that she provided Mother with bus tokens when she requested them.

**{¶ 29}** Davis stated that in May, 2009, she advised Mother to contact CARE House regarding an interview of her children conducted there about the allegations of sexual abuse. In response, Davis testified that Mother advised her that she did not believe what happened to her children, and that she alternatively believed that "something happened, she doesn't know what," and "she felt that the aunt had something to do with the allegations." Davis stated that she provided Mother with contact information for CARE House, and that when she attempted to follow up with Mother in June, 2009, Mother "got very angry with me, and she said that that (sic) was not on her case plan and she didn't need to know what happened to the boys."

{¶ 30}   Teresa Waller testified that she is an intake worker at MCCS, and that she works at CARE House, which is a "child advocacy center."   She stated that she is trained in forensic interviewing.   Waller testified that she interviewed D.H.3 after receiving a referral regarding sexual abuse in October, 2008.   Waller stated that D.H.3 told her that on at least two occasions, D.W.1, while he resided with Mother, had asked D.H.3 to perform oral sex on him and "put his private in D.H.3's mouth."   Waller stated that D.H.3 described D.W.1 as "his father, because of his younger siblings, that he was the father to them."   Waller stated that D.H.3 told her that D.W.1 told him not to tell anyone about the abuse.   Waller stated that she discussed the allegations with C.J., with whom the children resided at the time, and that she made a referral for counseling.

{¶ 31}   Jo Howard, a detective with the Dayton Police Department Special Victims Unit, stated that she conducted a forensic interview of D.H.2, on October 23, 2008, at CARE House, and that after doing so, she felt she had enough information to pursue a criminal case.  Howard stated that after the interview, she discussed the matter with Mother, who "stated that she did not believe her sons, that they were both lying."   Howard stated that she told Mother to have D.H.1 contact her, and although Mother stated that she would do so, Howard testified that she never heard from D.H.1.

{¶ 32}   M.R. testified that he is a licensed foster parent, and that he and his wife have custody of D.H.3.   He stated that his wife's sixteen year old nephew also resides in their home.   M.R. stated that D.H.3 has lived in his home since March, 2009, and that he and the nephew share a room.   M.R. stated that he and his wife are in the process of becoming foster-to-adopt providers, and that if they had the opportunity, they would "absolutely" adopt

D.H.3. On cross-examination by counsel for D.H.2, M.R. stated that if he adopts D.H.3, he is willing to maintain contact between D.H.3 and his three brothers.

{¶ 33} F.R., M.R.'s wife, testified that she and M.R. "would be willing to adopt" D.H.3, that they have had no concerns about his placement in their home, and that he is bonded to her and M.R. She stated that they meet his needs, and she is willing to maintain contact between D.H.3 and his siblings.

{¶ 34} Mother testified that she fully understands her case plan objectives. She stated that she has resided in Columbus since November, 2009, having previously resided in an apartment in Dayton for two years on Central Avenue. Mother stated that she has been employed in Columbus at "KFC Long John Silver" since December 2, 2009, where she earns $7.30 an hour and works 40-45 hours a week. Mother stated that, if she regains custody of her children, she will be eligible for medical benefits and food stamps. Mother stated that she is not currently engaged in therapy because "I don't have any medical" because "my kids got removed from the home."

{¶ 35} When asked why she moved to Columbus while her case was pending, Mother replied, "I moved to Columbus to further myself. I needed a new start. I moved up there due to I have family up there. I have a lot of support up there. And I moved to get myself together. And I have family down here that was - - they wasn't here to help me. They was against me. So, I moved to further myself." Mother stated that her mother, her sister, a paternal aunt, and five cousins live in Columbus. Mother stated that she can protect her children. She stated that she learned of the allegations of sexual abuse in October, 2008, from C.J., while the children were in C.J.'s custody. Mother denied having any contact with

Jo Howard and ever being at CARE House. Mother stated that she was never asked to be present for an interview at CARE House.

{¶ 36} Regarding the abuse, Mother stated, "I didn't believe the allegations because how it was said to me, how, you know, they told me about it. And I was in love with this man. * * * I wasn't for sure how this man was." According to Mother, "[C.J.] told me that * * * my second youngest was caught sucking my second oldest son's penis." Mother stated that the children never told her that they had been sexually abused by D.W.1. Mother stated that she now does believe that her sons were sexually abused, and that her initial disbelief caused her relationships with them to suffer. She stated that MCCS has not made any referrals for family counseling. Mother stated that she visited D.W.1 in jail in October, 2009 and asked him if he "touched" her children, and that she subsequently changed her opinion regarding the abuse.

{¶ 37} Mother stated that Merritt advised her not to move to Columbus, "due to the case plan." She stated that she visited her children once in December, 2009, and not at all in November and January, "[d]ue to me working." Mother stated that if her children are returned to her, she will be eligible to move into a three bedroom apartment. Mother testified that she feels that she can protect her children from any future harm, and she stated, "I wouldn't have a male around them. And I wouldn't have a male staying in my home." Mother stated that she and D.W.1 were in a relationship for five years, and that they lived together "off and on two years." Mother stated that she considered his relationship with her children to be a father/child relationship, and that he babysat the children while she worked occasionally. She stated that the nature of the relationship D.W.1 shared with D.H.2 and

D.H.3   was a factor in her initial disbelief that the sexual abuse occurred.

{¶ 38}   On cross-examination by the prosecutor, Mother stated that she has not identified a day care provider for the children in Columbus, but that she is eligible for "Title 20," since she is employed, and that is "how I can get day care."   She stated that her lack of contact with her children has not diminished the bond she shares with them.   Mother stated that she visited D.W.1 after his mother contacted her and told her that he was in Dayton. Mother stated that she still talks to D.W.1's mother "every now and then."   Mother acknowledged that the fact that she was "in love" with D.W.1 fostered her disbelief of her children.   Mother stated that she did not discuss the allegations of sexual abuse with Merritt, but that she did discuss them with Davis.   When asked about her ability to protect her children in the future, Mother responded, " * * * I changed.   I changed as far as I look more into a relationship, as far as when I meet a man.   I'm * * * looking in the right places to see what this man about (sic).   And I just don't have no relationship, because of dudes, what happened to my kids."   Mother stated that she was recently arrested in Miamisburg for "failure to reinstate my license."   Finally, Mother testified that she had a strong bond with her children while they were in the care of her aunt, and that during that time she visited them every day.   She stated that after her visitation was reduced when the children were in the custody of MCCS,   that her bond with them deteriorated.

{¶ 39}   Mother asserts two assignments of error which we will consider together. They are as follows:

"THE DECISION OF THE COURT GRANTING PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

And,

"THE DECISION OF THE COURT GRANTING PERMANENT CUSTODY WAS LEGALLY INSUFFICIENT."

{¶ 40} According to Mother, she has substantially complied with the case plan established by MCCS in the following areas: "housing, employment, mental health counseling, psychological evaluation and parenting assessment, and visitation," and she further asserts that she is able to protect her children from sexual abuse in the future. Mother argues that the "record shows that she has acknowledged the abuse and has stated that she will not let that happen again. Without this fear factor of the sexual abuse, it is against the manifest weight of evidence to separate [Mother] from her children forever and to award Permanent Custody to MCCS." According to Mother, she "should be awarded Legal Custody with continuing Protective Supervision by MCCS."

{¶ 41} The law governing the termination of parental rights is as follows:

The Revised Code authorizes a trial court to terminate parental rights and grant permanent custody to the State upon a finding, by clear and convincing evidence, that permanent custody is in a child's best interest and that the child has been in the State's custody for at least twelve of the preceding twenty-two months. R.C. 2151.414(B)(1)(d). Alternatively, a

trial court is authorized to grant permanent custody to the State if it finds, by clear and convincing evidence, that permanent custody is in the child's best interest and that the child cannot be placed with a parent within a reasonable period of time or should not be placed with either parent. R.C. 2151.414(B)(2).

When considering a motion for permanent custody, a trial court must apply R.C. 2151.414(E), which identifies factors for determining whether a child cannot or should not be placed with either parent within a reasonable time. If a court finds, by clear and convincing evidence, that any one of the R.C. 2151.414(E) factors exist, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." * * * *In re H.T. & Z.T.*, 2d Dist. Greene No. 10-CA-29, 10-CA-30, 2011-Ohio-1285, ¶ 22-23; *In re K.B.F.*, 2d Dist. Montgomery No. 24891, 2012-Ohio-1855, ¶ 51.

*In re T.J.*, 2d Dist. Montgomery No. 25022, 2012-Ohio-3399, ¶ 10.

**{¶ 42}** As this court has previously noted:

Clear and convincing evidence is evidence that will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. * * * The trial court's decision relating to permanent custody of children will not be overturned on appeal because it is not supported by sufficient evidence or is against the manifest weight of the evidence so long as the record contains competent, credible evidence from which the court could

have formed a firm belief or conviction that the essential statutory elements have been established. * * * *In re Alfrey*, 2d Dist. Clark No. 01CA0083, 2003-Ohio-608, ¶103.

**{¶ 43}** As noted above, the trial court found by clear and convincing evidence that the factors set forth in R.C. 2151.414(E)(1) and (4) exist and that the children cannot be placed with Mother within a reasonable time. We agree with the trial court.

## I. R.C. 2151.414(E)(1)

**{¶ 44}** R.C. 2151.414(E)(1) directs the court to consider whether:

the parent has failed continuously and repeatedly to substantially remedy the problems that initially caused the child to be placed outside the home. * * * [T]he court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

**{¶ 45}** At the time of the hearing, Mother was living in a one bedroom apartment in Columbus, and she previously resided in a one bedroom apartment in Dayton. While she has maintained stable housing, her current residence, as noted by the trial court, is insufficient to meet the children's needs. While she may have been able to obtain more suitable housing, were she to regain custody of the children, we cannot conclude that this case plan objective was completed.

**{¶ 46}** Regarding employment, while Mother was earning sufficient income to meet

the children's needs at the time of the hearing, she was previously unemployed, as the trial court noted, from May through October, 2009, having been fired from a previous job. Further, Mother had previously lost her food stamps benefits due to her failure to appear at a job site. Rodgers testified that Mother had difficulty maintaining employment. Given her work history and lengthy unemployment, and considering that Mother had only been employed at her current position for a little more than two months at the time of the hearing, we cannot conclude that this case plan objective was satisfied.

{¶ 47} Regarding therapy, Rodgers recommended that Mother obtain individual and family therapy, as well as anger management therapy. Rodgers diagnosed Mother with a major depressive disorder which caused her to have difficulty with social relationships, and she determined that Mother was not adequately bonded with her children, especially the older two boys. After missing initial sessions with Gilbert, Mother participated consistently and made progress from March, 2008 until November, 2009, although she only attended one of the anger management sessions that Gilbert recommended. After her move to Columbus, Mother kept only two appointments with Gilbert. While Mother asserts that the move to Columbus "is a consequence of success of her mental health therapy" and indicates "that she was confronting her mental health issues," Gilbert stated that she believed Mother was "running from her situation, because she was afraid and confused." Gilbert further recommended that Mother continue her therapy and testified that Mother "acknowledged that she needed it." Gilbert testified that Mother's anger remains a concern. Mother was not engaged in therapy at the time of the hearing, and Merritt testified that she did not consider this objective to be satisfied. Since Mother was not successfully terminated from

counseling, we agree with the trial court that this objective was not satisfied.

{¶ 48}     Regarding visitation, while Mother attended her visitations regularly while she resided in Dayton, at the time of the February 16, 2010 hearing, she had not visited the children since December 23, 2009, and she testified that she did not visit them at all in November, 2009.   We agree with the trial court that this objective has not been satisfied.

{¶ 49}     Having reviewed Mother's case plan objectives and her progress, we agree with the trial court  that she has failed continuously and repeatedly to substantially remedy the problems that caused the children to be removed from her care.

II.   R.C. 2151.414(E)(4)

{¶ 50}   R.C. 2151.414(E)(4) directs the court to consider whether the "parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child."

{¶ 51}     D.W.1 raped D.H.2 and D.H.3 while they resided with Mother, and she did not believe that the abuse occurred for over a year, placing her "love" for D.W.1 ahead of her children's needs.  Mother told Davis in June, 2009, that she did not "need to know what happened to the boys."   Mother told D.H.2 that she did not believe him while he was in the hospital suffering from meningitis, and she told D.H.3 that she did not believe him in the course of a visitation with him.   While her case was pending, Mother moved to Columbus, despite being advised not to do so by Merritt, and her visitation with the children ceased. While she acknowledged that she needs further therapy, she was not engaged in counseling at the time of the hearing. Her current apartment is inadequate to meet the needs of her children.

Accordingly, we conclude that Mother has demonstrated a lack of commitment toward her children and an unwillingness to provide an adequate, permanent home for them.

### III.   Best Interest

**{¶ 52}**   Regarding the best interest of the children, the trial court must apply the non-exclusive list of factors set forth in R.C. 2151.414(D).   These include: (a) the interaction and interrelationship of the child with the biological family, foster family, and any other persons who may significantly affect the child; (b) the wishes of the child as expressed directly or through the G.A.L. with due regard for the maturity of the child; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to MCCS; and (e) whether any of the factors listed in (E)(7) to (11) apply.   We agree with the trial court that the factors listed in (E)(7) to (11) do not apply.

**{¶ 53}**   The record supports a conclusion that it is in the best interest of the children to award permanent custody to MCCS.   Rodgers testified, as did Mother, that her bond with her children was inadequate.   We agree with the trial court that Mother "effectively separated herself from her children" when she moved to Columbus and ceased visitation.   The children do not have relationships with their fathers.

**{¶ 54}**   D.H.3's foster family would like to adopt him.   The G.A.L. reported that D.H.3 wished to remain with his foster family.   While D.H.2 did not wish to remain in MCCS' custody, he was represented by counsel at the final hearing, and no objections were filed on his behalf to the decision of the magistrate.   As the trial court indicated, at the time of the hearing, D.W.2. and D.W. 3 were too young to adequately express their wishes

regarding custody.

**{¶ 55}** As the court noted, all four children have been involved with MCCS since shortly after their births. They were removed from Mother's care in August, 2007, and they have been in foster care since March, 2009.

**{¶ 56}** Since Mother failed to satisfy her case plan objectives and moved to Columbus, and since there are no relatives able to care for them, the trial court correctly concluded that the children, all of whom are adoptable, have an immediate need for a legally secure permanent placement.

**{¶ 57}** Having thoroughly reviewed the entire record, we conclude that the trial court's judgment was supported by clear and convincing evidence, and that the children cannot be placed with Mother within a reasonable time, since Mother failed to remedy the conditions that led to their removal and also demonstrated a lack of commitment to the children. We further conclude that awarding permanent custody to MCCS is in the children's best interest. Accordingly, Mother's assigned errors are overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

Andrew T. French
Hilary Lerman
Hon. Nick Kuntz