[Cite as *In re R.Y.*, 2013-Ohio-3942.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

IN RE: R.Y., JR., C.Y., A.Y., A.Y. and S.Y.   :

|  |  |
|---|---|
| : | C.A. CASE NO.    25694 |
| : | T.C. NO.    2000-5797 |
|  | 2009-1876 |
| : | 2009-1877 |
|  | 2009-1879 |
| : | 2009-1881 |
| : | (Civil appeal from Common Pleas Court, Juvenile Division) |
| : | |
| : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____13th____ day of ____September____, 2013.

. . . . . . . . . .

MATTHEW T. CRAWFORD, Atty. Reg. No. 0089205, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Appellee, Montgomery County Children Services

JEFFREY T. GRAMZA, Atty. Reg. No. 0053392, 131 N. Ludlow Street, Suite 1210 Talbott Tower, Dayton, Ohio 45402
        Attorney for Appellants, Parents C.Y. and R.Y.

. . . . . . . . . .

FROELICH, J.

{¶ 1} Father and Mother appeal from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which granted permanent custody of their five children to Montgomery County Children Services ("MCCS").

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3} Father and Mother were married at the time of the hearing in this case, and they were the parents of five children together: R.Y., Jr. ("R.Y."), the only boy, who was 10 when the hearing in this case began, S.Y., age 7, Ar.Y., age 5, and twins girls, C.Y. and Ab.Y., age 3.

{¶ 4} Father and Mother have a long history of involvement with MCCS. Before their relationship began, each had a child from another relationship removed from his or her custody. Further, R.Y. had been adjudicated to be dependent in December 2000, when he was three months old; he was returned to his parents about ten weeks later. When R.Y. was two years old, Father pled no contest to and was found guilty of ten counts of pandering sexually oriented material involving a minor, after R.Y.'s guardian ad litem observed child pornography at the home.

{¶ 5} In April 2009, MCCS removed Father and Mother's five children from the home and placed them in foster care. MCCS filed a motion for interim custody, citing concerns over extensive cockroach infestation, other concerns about sanitation, and ten referrals in a 14-month period for physical abuse, neglect, and emotional maltreatment. MCCS had also received reports of sexual abuse which, though unsubstantiated, "raise[d] concern for the children's safety due to Father's history of sex related crimes involving minors." Interim temporary custody was awarded to MCCS.

{¶ 6} Neglect and dependency complaints were filed for each of the children except R.Y., who had previously been adjudicated dependent. In July 2009, S.Y., Ar.Y., C.Y. and Ab.Y. were adjudicated dependent and neglected. In October 2009, MCCS was awarded temporary custody of all the children. Temporary custody was extended two times, in April 2010 and December 2010.

{¶ 7} In February 2011, MCCS filed a motion for permanent custody of each of the five children. In March 2011, Father and Mother filed a motion for custody of the children. A hearing was held before a magistrate on several dates between June 2011 and February 2012. On March 7, 2012, the magistrate denied the parents' motion for custody and granted permanent custody of the children to MCCS. The parents filed objections to the magistrate's decision. On March 6, 2013, after an independent review of the evidence, the trial court overruled the parents' objections and adopted the decision of the magistrate that the children should be placed in the permanent custody of MCCS.

{¶ 8} Father and Mother appeal, raising one assignment of error.

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GRANTING PERMANENT CUSTODY TO MONTGOMERY COUNTY CHILDREN SERVICES, AS THE AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILDREN.

{¶ 9} Father and Mother contend that the trial court's conclusions that it was in the children's best interest to grant permanent custody to MCCS and that the children could not be returned to their parents within a reasonable time were not supported by clear and convincing evidence. They also claim that MCCS could have done more to support them

and to work toward reunification.

{¶ 10} In Ohio, a trial court is authorized to terminate parental rights and to grant permanent custody to a children services agency in several enumerated circumstances. These circumstances include a finding, by clear and convincing evidence, that permanent custody is in a child's best interest, coupled with a finding that the child 1) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent, for one of the reasons specified in R.C. 2151.414(E), or 2) has been in the temporary custody of a public children services agency for twelve or more months of a consecutive twenty-two-month period. R.C. 2151.414(B); *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.*, 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8. The burden of proof is on the children services agency. *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 14.

{¶ 11} We review a trial court's decisions regarding the best interest of a child and whether the child can be returned to the parent's care within a reasonable time for an abuse of discretion. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48; *In re K.H.*, 2d Dist. Clark No. 2009-CA-80, 2010-Ohio-1609, ¶ 66. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *In re D.H.*, 10th Dist. Franklin No. 11AP-761, 2012-Ohio-2272, ¶ 9; *In re S.M.*, 2d Dist. Montgomery No. 24539, 2011-Ohio-6710, ¶ 4.

{¶ 12} R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents

and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

{¶ 13}    R.C. 2151.414(E) identifies factors for determining whether a child cannot or should not be placed with either parent within a reasonable time. If a court finds, by clear and convincing evidence, that any one of the R.C. 2151.414(E) factors exists, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *In re H.T. & Z.T.*, 2d Dist. Greene Nos. 10-CA-29, 10-CA-30, 2011-Ohio-1285, ¶ 23; *In re K.B.F.*, 2d Dist. Montgomery No. 24891, 2012-Ohio-1855, ¶ 51.

{¶ 14}    The evidence presented at the hearing in support of MCCS's motion for permanent custody was as follows.

{¶ 15}    Thomas A. Jones, a mental health counselor, testified about the oldest child, R.Y. Jones began treating R.Y. in November 2009, one and one-half years before the hearing. Jones testified that R.Y. was referred to him because MCCS had concerns about his anger and sexual behavior. Jones initially found R.Y. to be "very resistant" and "defensive," with cognitive limitations and behavioral issues; his diagnoses included oppositional defiant disorder, attention deficit hyperactivity disorder, and "mild mental retardation." R.Y. made good progress during the course of his treatment with Jones, which included medication and putting into place strategies with his foster family to address his

behavioral issues. Jones testified that R.Y. needs a consistent, loving caregiver, and that the foster mother provided this type of environment. He also testified that R.Y.'s inappropriate sexual behaviors had ceased by the time of the hearing.

{¶ 16} C.Y. and Ab.Y. are twin girls, and they are the youngest of the family's children. C.Y. and Ab.Y. were 19 months old when they were removed from their parents' custody, and their foster mother, Kristy F., testified at the hearing. She stated that, at first, the twins exhibited behavioral issues; Ab.Y. was afraid of adults, particularly men, and C.Y. preferred to engage only with adults, avoiding other children. Both girls were aggressive, hitting other children, biting, and pulling hair. The girls also had eating difficulties, frequently screaming for food but refusing anything that was not finger food, and they experienced delays in development and speech. The diagnoses for both girls included learning disorders, attachment and adjustment disorders, post-traumatic stress, and anxiety. According to their foster mother, the girls behaved like nine-month olds when they were 19-months old. Over time, the behavior of Ab.Y. and C.Y. improved, but some of their behavioral problems would return when they were stressed by overstimulation, any change in routine, and visitation with their biological parents.

{¶ 17} Ab.Y. and C.Y. received developmental support services through PACE and Help Me Grow up to age 3, and thereafter from an MRDD preschool. However, during some periods, obtaining services outside the home was so stressful for the girls that in-home services were implemented. They have received speech therapy and occupational therapy, and they have IEPs at school.

{¶ 18} The foster mother testified that visitation with the biological parents is very

stressful for the girls, and in particular for Ab.Y. She testified that the children would become very agitated and upset if they knew or believed that a visitation would occur on a given day, such that she would not tell them about a visit until just before it was time to go; on days when no visit was scheduled, she would assure the girls of this fact in the morning, and they would relax for the rest of the day. The foster mother stated that, during a three-month period in 2012 when no visitation occurred, the twins' behavior changed and they "blossomed," seeming happier and more relaxed, requiring less "maintenance," and their speech and development improved. When visitation resumed, diarrhea and vomiting frequently occurred when the girls learned that they were to have visitation. She also testified to her observations that the parents could not tell the twins apart during visitation and that the parents behaved very inappropriately when they visited C.Y. at the hospital following an appendectomy, expecting her to play and coming to visit at night.

{¶ 19} Dr. Antoinette Cordell, a clinical and developmental psychologist, evaluated Ab.Y. and C.Y. and treated them for more than a year prior to her testimony. She testified that Ab.Y. had a cognitive delay in processing information, which indicated "early environmental neglect." Ab.Y.'s assessments improved (from below average to low average) after her placement in foster care. C.Y. showed a very similar pattern of development. The pace of the children's development in foster care, which was "disproportionate" to their development up to that time, and their lack of normal speech or even "structure of language" at the time of the removal from the biological parents' home led Cordell to conclude that the children had been neglected by their parents. Cordell testified that both children acted less mature when they were with their parents than they do

otherwise, including a failure to use their language and eating skills, and acting "like birds" who expect food to be put into their mouths. She also testified that the twins have a "flat affect" with their parents, as opposed to more animated behavior in foster care.

{¶ 20} Cordell diagnosed both girls with emotional and behavioral disturbances, learning disabilities, and mixed receptive and expressive language disabilities; she continued to evaluate them for PTSD and cognitive disabilities, but had not yet made those diagnoses, in part because of the significant progress the children were making in foster care. She testified that Ab.Y. and C.Y. were showing more confidence and trust in recent months as well.

{¶ 21} Cordell testified that, in order to thrive and continue their progress, Ab.Y. and C.Y. need a predictable, safe, structured environment with consistent intervention services and cognitive stimulation. She also classified the girls as "extremely vulnerable" and stated that "any possibility of neglect for them from here on would have devastating effects."

{¶ 22} Dawn Morton, a visitation specialist with MCCS, observed the parents' visitation with the children in June and July 2009. She testified that food was a focus of the meetings, but that there was no "order" to the meals. For example, no one was sitting, R.Y. (the son) was off by himself, and Ab.Y. was leaning on her father between his legs. She observed that R.Y. was ignored during much of the visit, although he was yelled at by the parents; R.Y. seemed upset, very nervous, and uncomfortable during the visit, and his parents made no attempt to console him when he was upset.

{¶ 23} Morton observed that Father exhibited behavior toward the twin girls,

Ab.Y. and C.Y., that seemed to have a sexual undertone, such as having the girls lean into his crotch and stroking their hair, and that she saw R.Y. imitating this behavior with the girls. Father touched and held the children a great deal, but did not initiate appropriate play. According to Morton, Father was more physically affectionate than Mother, but he also used intimidation, got angry, and exhibited aggressive behavior toward her (Morton) in the presence of the children.

{¶ 24} Morton also observed that the parents were not able to handle S.Y. and Ar.Y., who were the most mobile children. S.Y. and Ar.Y. were "exceptionally touchy" with Morton during the visitation, which was not a "typical response" to a stranger; the parents did not try to redirect S.Y. and Ar.Y. from this behavior, "as if it was a common and ordinary thing."

{¶ 25} Morton believed that Mother could differentiate the twins, but Morton was unsure whether Father could, based on her observations of visitation.

{¶ 26} After her evaluation of the visitation sessions, Morton recommended that the visitations continue, with supervision, that Father be referred for mental health services with a sexual abuse specialist, and that Mother be referred for assertiveness training. She recommended that both parents attend parenting classes. Morton expressed that she was not confident in the ability of the parents to manage the children on their own, but that this might be possible with supervision and monitoring. Morton acknowledged that the parents were "trying," but stated that she was unsure, on a cognitive level, whether (or how much) they could process and understand what they were taught about appropriate parenting.

{¶ 27} Dr. Juliet King, a forensic psychologist, evaluated Mother and Father in

December 2010. She testified that the parents acknowledged the reason for concern about some of R.Y.'s behaviors, but did not acknowledge any reason for concern about any of the girls. After observing the parents with their children, King concluded that Father was "appropriately affectionate" with all of the children, but Mother was "pretty harsh, mocking, and sarcastic." With respect to diagnoses, Dr. King testified that Mother was in the "mildly mentally retarded" range of intellectual function, with associated adaptive deficits, meaning that she had a low IQ and low day-to-day functioning. She further testified that Father did not function at as low a level as Mother, but that his functioning was still low, with higher adaptive (day-to-day) functioning.

{¶ 28} With regard to the ability to parent, Dr. King expressed "significant concerns about their ability to independently parent these kids," because they may not be able to learn new ways of interacting with the children. Although she stated that the parents have a "good basic foundation" of parenting knowledge, they did not seem able to expand upon it. Dr. King also expressed "serious doubts" about the parents' ability to care for all five of their children in light of their own "deficits observed" and the parents' lack of an accurate view of the nature and extent of the childrens' problems. In sum, Dr. King concluded that it would be difficult for parents who do not have intellectual deficits to care for children with these kinds of problems, and that Mother and Father were unlikely to be able to do so.

{¶ 29} Denise Rinehart began working with the family in 2000 through the Help Me Grow program. Three of the children (R.Y. and the twins) received speech therapy through Help Me grow from ages 0-3. Rinehart testified that the parents had cognitive

limitations but loved their kids and were compliant with the tasks she asked them to perform, such as cleaning the house. She also testified that the parents had provided appropriate housing, food, and medicine and had been responsible about visits to the program.

{¶ 30} Kent Depoorter was the guardian ad litem for all of the children in this case and had been involved with Mother and Father for many years. This involvement included serving as the guardian ad litem for the other children that each of the parents had previously had with other people. The issues in those cases had also involved the parents' low-level of functioning and lack of appropriate structure for the children. The older children had been removed from each of the parents' custody.

{¶ 31} Depoorter testified that, in this case, all five children were removed from the home at the same time in 2009 and that he had been the only guardian ad litem for the children.

{¶ 32} Based on his observations, Depoorter testified that the children were always "wild" when they were with the parents; there were no boundaries and there was no "proper parenting." For example, he observed Ab.Y. and C.Y. running with knives, and neither parent redirected them. He expressed his belief that Mother does not have the capacity to engage the children and that Father, while capable of parenting and interacting appropriately with one child, has not shown that he can parent or care for five children, because he appears unable to "focus on the big picture." Depoorter stated that the children hit each other during visits with the parents and "act out" at visitation in ways that they do not in foster care. "[T]hrough no fault of their own, * * * [parents] are not capable of setting up those

boundaries for those kids to thrive." Depoorter also testified that there did not appear to be any family members or others that the parents could consistently rely on for help.

{¶ 33} With regard to the living environment and life skills of the parents, Depoorter testified that the parents prepared "a ton" of food for meals, but that he had concerns about food safety, because he had observed discolored meat in the freezer. He testified that the cleanliness of the home was "minimally adequate," but that the garage was in horrible condition and presented hazards for the children. He opined that the parents were unable to comprehend basic safety issues, such as the risk posed by a hot grill or the need to be able to watch what the young children are doing.

{¶ 34} With respect to R.Y., Depoorter testified that, when he was first removed from his parents' home in 2009, he acted out sexually "doing completely inappropriate behavior," such as masturbating on a foster home's porch and attempting to put an electrical cord into a pet's "butt." R.Y. had problems with speech, ADHD, and other behavioral issues, and was "kind of out by himself a lot of times," including during visitation with his parents. Since entering foster care, however, R.Y. was doing well in school and with speech therapy. His self-esteem had improved and he was "very happy with himself." Depoorter attributed these changes to the boundaries that the foster family provided, which created an atmosphere in which R.Y. could succeed; Depoorter stated that R.Y. is now "a completely different kid." Depoorter stated that, at the time of the hearing, R.Y. had not acted out sexually in more than a year and that his behavior at school was appropriate.

{¶ 35} Regarding the middle children, S.Y. and Ar.Y., Depoorter testified that their behavior is "vastly improved" since being placed in foster care. Ar.Y. initially

screamed the whole time during visits, but now calmed down more quickly. S.Y. "pushes the envelope" with her mother, to which Mother "reacts as a child." Depoorter reported that Mother tends to be sarcastic and harsh with the children and to focus on only one thing, such as eating, during their visits; food was the focus of every visit he observed. Depoorter testified that S.Y. wants to succeed and is very proud of herself for accomplishments made in foster care, such as memorizing books, which she can then "read" to others. Similarly, Depoorter stated that the twins, C.Y. and Ab.Y., are learning skills and appropriate behaviors in foster care that they had not learned before, such as sitting during meals and normal communication skills, and that they are doing well in school.

{¶ 36} Based on his observations, Depoorter concluded that the parents are "not capable of doing what's necessary to avoid neglecting the kids' needs," even with the support of counseling and parenting classes provided by MCCS. He further concluded that it would be "tragic" to put the children back in the parents' home because they will "slide backwards" and "have no opportunity in life to be successful." He stated that the children were "thriving" in their foster homes, where they were getting the structure that they need, and that he could not see the parents' being able to provide such structure in the foreseeable future. For these reasons, Depoorter recommended that MCCS be granted permanent custody of the children.

{¶ 37} The caseworker involved with the family when the children were removed from the home, Jenny Geer, testified that she had never witnessed the parents controlling the children effectively, even after they completed parenting classes that included demonstrative as well as classroom instruction; the class had not made an appreciable difference in the

parents' behavior. For example, she testified that Mother had been taught about giving children "3 strikes" before imposing a timeout for inappropriate behavior, but Geer had witnessed Mother impose "strike three" seventeen separate times with one child before attempting to impose a timeout. Geer also stated that Mother could not effectively impose a timeout on the children, even if she tried to do so.

{¶ 38} The current MCCS caseworker, Shelly Agarwal, also testified that the children were thriving in their respective foster homes. R.Y. was taking his medications regularly, had good attendance at school and therapy sessions, and was close to his foster family and comfortable there. He listened to directions from his foster mother, whereas he did not listen to his parents. S.Y. and Ar.Y., who were at that time together in a foster home, were also doing well. S.Y. seemed happy in the home. Although Ar.Y. had developed a good relationship with her foster mother, she still exhibited behavioral problems at home and at school. Like R.Y., Ar.Y. followed directions from her foster mother better than she did from Mother and Father. According to Agarwal, Ab.Y. and C.Y.'s special needs were being met in their foster home with speech therapy and counseling, and they were playing well with other children. During supervised visitation with their parents, the twins had initially been "scared," with their "bodies * * * kind of cramped up" and stomach aches, and they still do not respond positively to visitation. Agarwal testified that Ab.Y. and C.Y. behave differently with their parents than they do in the foster home, exhibiting less verbal communication, "closed" and "tight" behavior, or acting like babies.

{¶ 39} Agarwal testified that reunification with the parents was not possible in the foreseeable future because, after more than two years of "complete services" from the

agency, the parents were still unable to handle the children's behavior even in the setting of supervised visitation. Agarwal testified that all of the children were adoptable, and that with the exception of Ar.Y., all of the current foster parents were willing to adopt the children.

{¶ 40} Four witnesses testified on behalf of the parents, including the parents themselves.

{¶ 41} Larry Postell, a social worker who specialized in working with survivors of sexual trauma and perpetrators of sexual violence, counseled Father due to MCCS's unverified concerns about inappropriate sexual behavior with the children. Postell testified that Father had been compliant with Postell's recommendations about avoiding high-risk situations, and he opined that Father was not a risk as a sex offender. Postell testified that the sexual "acting out" of the children after their removal from the parents' home did not cause him to be concerned about Mother and Father's care for the children, that he did not have concerns about the interaction he had observed between the parents and the children, and that he recommended reunification.

{¶ 42} Naomi Alexander, a marriage and family therapist, worked with both parents while the children were in the temporary custody of MCCS. She stated that both parents were "open, honest, and participatory." She observed both parents during visits with the children, and she described the family's interaction as "very joyful, affectionate, hugging, smiling, and laughing." She found the visits to be "chaotic" but "normal," and the parents' interaction with the children to be appropriate. She acknowledged that the parents still need direction from others, but concluded that "that's the process" (i.e., part of the

purpose of counseling).   Alexander recommended reunification.

{¶ 43}   Mother testified that she would clean up her house if the kids were coming back, that she had enough beds for all the children, and that she no longer had bugs at the house.   She also stated that she had never seen Father do anything sexually inappropriate with the children.

{¶ 44}   Mother reported that she had completed an Artemis program aimed at domestic abuse, but she denied that any abuse had occurred; she had also completed parenting classes and counseling.   However, she could not identify any of the children's diagnoses or the medications they were taking.   She also could not recall the children's birth dates or grades in school and was unfamiliar with the purpose of an IEP, although each of the children had one.   She described, very generally, how she would do a better job of controlling and parenting the children.   For example, she stated that she would "try and get my kids to do what they're supposed to do."

{¶ 45}   Father also testified that he would clean up potentially dangerous conditions, such as the presence of fertilizer and a wood scrap pile at the home, if the children returned.   He testified that he cooks and is able to provide good, unexpired food. He stated that he had completed a psychological assessment, parenting classes, counseling, and other programs, and that he believed these interventions had improved his parenting.

{¶ 46}   When asked about the children's chaotic behavior during visits with the parents, Father suggested that the behavior was "because they [are] not in my care."   Father was generally unfamiliar with the children's diagnoses and medications, although he did acknowledge that R.Y. had difficulty with speech.   Father thought that this language

difficulty might relate to the fact that English was a second or third language for Father, and he claimed that he would "reach out for somebody" to help R.Y. with his speech, if necessary. When asked how he would respond if the children acted out against one another, Father denied that such behavior had happened or would happen in the future. When asked how he would deal with hyperactivity, attention deficit, or other of the children's specific diagnoses, Father stated that he would do "the best that [he] can do."

{¶ 47} In its decision, the trial court addressed the factors set forth in R.C. 2151.414(D), related to the best interest of the children. The trial court found that the children had good relationships with their foster families and "appear[ed] bonded" to their biological parents. It noted, however, that the interaction between the parents and the children during visitations was "hectic and chaotic and ha[d] not improved over time"; as a result, the parents were unable to control the children or establish boundaries and structure, such that "the children do whatever they want."

{¶ 48} The court acknowledged that Mother and Father had completed the assessments and parenting classes that they had been asked to complete and had been consistent with visitation with the children. However, the conditions of the home "continue[d] to pose considerable risk" and "serious concerns [remained] regarding the parents' ability to independently parent the children." Despite the parents' "active participation in interventions," they were unable to demonstrate appropriate parenting skills. The court also recognized Dr. King's concern that the parents did not "perceive" the problems facing the children and the family, and the parents' own testimony that they did not know the children's birth dates, grade levels, diagnoses, or treatment specialists.

{¶ 49}    The court stated that the ages and cognitive limitations of C.Y. and Ab.Y. precluded them from expressing their wishes regarding placement, and that the older children had "vacillated" about where they wished to be placed.

{¶ 50}    The trial court found that the children were "in immediate need of legally secure permanent placement" because of the "parents' inability to appropriately parent the children, perceive and care for the children's special needs," and the children's extended removal from the home.  The court further found that the children were adoptable, and that no family members were willing or able to care for the children.  Thus, the court found that it was in the children's best interest to grant permanent custody to MCCS.  The court also found that the children had been in the custody of MCCS for over 12 months of a 22-month period.  The court initially stated that it declined to consider whether the children could be placed with either parent within a reasonable time, because its finding about the length of MCCS's temporary custody made consideration of the latter issue unnecessary; however, later in its judgment, the court did state that placing the children with the parents within a reasonable time was not possible.

{¶ 51}    Having reviewed all of the evidence presented, we cannot conclude that the trial court abused its discretion in concluding that the best interests of the children would be served by awarding permanent custody to MCCS.  There was no question that the parents loved their children and attempted to address many of the concerns raised by MCCS about their parenting.  But the clear and convincing evidence supported the trial court's conclusion that, even after significant efforts at intervention, the parents were unequipped and unable to recognize, understand, and address the needs of these children.  The trial

court also did not abuse its discretion in concluding that the children could not be returned to the parents' custody within a reasonable time, and there was no dispute that the children had been in MCCS's custody for more than 12 of the previous 22 months.

{¶ 52}    The assignment of error is overruled

{¶ 53}    The judgment of the trial court will be affirmed.

. . . . . . . . . .

FAIN, P.J. and DONOVAN, J., concur.

Copies mailed to:

Matthew T. Crawford
Jeffrey T. Gramza
Hon. Nick Kuntz