[Cite as *In re J.G.*, 2014-Ohio-534.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY   COUNTY**

IN RE:                                           :
                                                 :          Appellate Case No. 25929
                   J.G.                           :
                                                 :          Trial Court Case No. 2011-6992
                                                 :
                                                 :          (Civil Appeal from Montgomery
                                                 :           County Juvenile Court)
                                                 :
         . . . . . . . . . . .

O P I N I O N

Rendered on the 14th day of February, 2014.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE D. PHIPPS, Atty. Reg. #0069829, Montgomery
County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box
972, 301 West Third Street, Dayton, Ohio 45422
         Attorneys for Appellee, State of Ohio

BRADLEY S. BALDWIN, Atty. Reg. #0070186, Baldwin & Valley Law, LLC, 854 East
Franklin Street, Centerville, Ohio 45459
         Attorney for Mother-Appellant

JENNIFER GETTY, 46 East Franklin Street, Centerville, Ohio 45459
         Guardian Ad Litem for J.G.
         . . . . . . . . . . . . .

HALL, J.,

         **{¶ 1}**      J.H. (Mother) appeals from the trial court's judgment entry awarding appellee

Montgomery County Children Services (MCCS) permanent custody of her child.

{¶ 2} Mother advances two assignments of error. First, she contends the trial court erred in granting MCCS permanent custody where the agency failed to prove by clear and convincing evidence that such a disposition was in the child's best interest. Second, she claims the trial court erred in allowing hearsay testimony during the dispositional hearing.

{¶ 3} The record reflects that Mother gave birth to J.G. in June 2011. The identity of the child's father is unknown. At the time of J.G.'s birth, Mother was fifteen years old and living in foster care herself. MCCS filed a dependency complaint regarding the child in August 2011. (Doc. #52). The trial court adjudicated the child dependent after a hearing and a stipulation of dependency. (Doc. #48). MCCS obtained temporary custody, which subsequently was extended. On May 28, 2013, the agency sought permanent custody. (Doc. #22). The trial court held a September 2013 dispositional hearing on the permanent-custody motion.

{¶ 4} Testimony from the dispositional hearing established that J.G. had been in foster care since leaving the hospital after birth. (Tr. Vol. I at 9). The child initially resided in the same foster home with Mother. (Tr. Vol. II at 5). J.G. later was moved to a different foster home. (Tr. Vol. I at 9, 11-12).

{¶ 5} MCCS caseworker Assinah Taylor testified that she had discussed Mother's case-plan objectives with her multiple times beginning in September 2012. (Id. at 13). According to Taylor, the objectives called for Mother "to complete her high school diploma or seek a GED; to gain employment; to complete parenting classes; to complete a parenting/psychological assessment; to engage in counseling; to visit [J.G.] consistently; to comply with the terms of her probation; [and] to also establish housing." (Id. at 16). The purpose of the counseling requirement was to address depression and substance-abuse issues. (Id.

at 17).

**{¶ 6}** Although Mother had completed some of her case-plan objectives, others remained unsatisfied. A recurring hindrance to Mother's progress involved her going "AWOL" from foster care. Taylor estimated that since she became the caseworker in September 2012, Mother had left foster care without permission for two or three days "on a monthly basis at least." (*Id*. at 16). On each occasion, Mother "would return intoxicated or under the influence of something. And she would indicate that she was using drugs, or she was drunk." (*Id*.).

**{¶ 7}** A more protracted AWOL episode occurred on January 20, 2013. At that time, seventeen-year-old Mother left foster care without permission and did not return until June 20, 2013. (*Id*. at 14). During that five-month period, Mother spoke to Taylor by phone and stated that she was pregnant. She also asked about J.G. She did not have any contact with the child, however, until her return just three months before the dispositional hearing. (*Id*. at 14-15).

**{¶ 8}** During the hearing, Mother engaged in the following discussion with counsel for MCCS regarding her case-plan progress and AWOL episodes:

Q. And [the caseworkers] talked to you about the fact that you needed to do certain things in order to get your child back, didn't they?

A. I mean, yes. But, I wasn't paying attention, nor did I understand. I was only fifteen.

Q. Okay. Well, were you paying attention earlier this year when you were seventeen?

A. Yes.

Q. Were you paying attention in December of last year when you decided

to take off for six months?

A. Yes.

Q. Okay. So you knew, then, when you left, that you had case plan objectives, correct?

A. Yes.

Q. Okay. And you knew that the Agency needed you to get a GED or complete some sort of education, right?

A. Yes.

Q. And you were talked to about that by both caseworkers, right?

A. Yes.

Q. And here we are, and you're already eighteen, and you just enrolled in a program that starts in October of this year, is that right?

A. Yes.

Q. And you don't know—you've never had one class yet, right?

A. No.

Q. And you don't know how long it's going to take you or how you're going to do in that class, do you?

A. No, but I know that I could do it.

Q. Well, [d]o you know how long the program is?

A. A few weeks.

Q. You think in a few weeks, you going to be ready to get your GED and take the test?

A. Yes.

Q. You didn't complete the Life Skills program, did you?

A. I ran away. No.

Q. You've run away a number of times, haven't you?

A. Yes.

Q. In fact, you were charged with unruly over ten times, weren't you?

A. Yes.

Q. And you had a number of additional charges of run away prior to that, correct?

A. Yes.

Q. Now, you also know that you were supposed to go to counseling, correct?

A. Yes.

Q. And you didn't do that until—are you in counseling now?

A. No.

Q. You also know that you're supposed to get substance abuse counseling and treatment. Are you in substance abuse treatment now?

A. No.

Q. Have you had substance abuse treatment?

A. No.

Q. Isn't it true that you told your caseworker the reason you were running away and not getting things done was that you were abusing illegal substances?

A. That was part of it.

* * *

Q. Okay. And so, how do you think it affected your child and your relationship when you were gone for six months?

A. I don't know. But I didn't feel like it was the right time to be around him.

Q. Did you think about him when you were gone?

A. Yes.

Q. But you spent six months not having any contact with him at all, correct?

A. Yes.

Q. You didn't come to visits, you didn't call and ask for a visit to be set up, nothing, right?

A. I wasn't allowed to, unless I would turn myself in.

Q. And you didn't want to turn yourself in because why?

A. I was going through depression, I was pregnant at the time. And just numerous things was going on.

Q. So, staying away for six months was what was best for you, right?

A. I guess. Yes.

Q. But you know when you're a mom, you have to do what's best for your child, right?

A. Yes.

Q. And that being away for six months, was that best for your child?

A. No. But, it doesn't matter to me, because I feel like I was sixteen—no I was seventeen. It's not like I could have my son, anyway.

(*Id*. at 14-16, 20-21).

{¶ 9} Upon returning from her lengthy AWOL episode, Mother testified that she unsuccessfully sought employment at various fast-food franchises. (Tr. Vol. II at 8). She also testified that she had completed parenting classes, had moved into an apartment with a friend, and had been visiting J.G. regularly. (*Id*. at 9-11). With regard to substance-abuse counseling, caseworker Taylor testified that Mother refused to complete the sessions. (Tr. Vol. I at 22-23). According to Taylor, Mother indicated that she did not need counseling and never was going to regain custody of J.G. anyway. (*Id*.).

{¶ 10} Taylor also testified about J.G.'s progress in foster care. She stated that she had been visiting the child at least twice a month since September 2012. (*Id*. at 10). In her opinion, the child was "doing very well" and was "on target" developmentally. (*Id*.). She described the child as happy, comfortable, and affectionate in the foster home, which includes two parents and three other children. (*Id*. at 35-37). Taylor testified that the foster family wants to adopt J.G. and that she foresaw no obstacles to adoption if MCCS obtained permanent custody. (*Id*. at 37-38). Taylor admitted the existence of a bond between Mother and J.G. (*Id*. at 51-52). She also acknowledged that Mother had interacted appropriately with the child during visitations. (*Id*. at 33-34). Although J.G. initially was hesitant around Mother after her five-month absence, the last few visits were "fine." (*Id*. at 33). In Taylor's opinion, however, the bond between Mother and J.G. is not as strong as the bond between the foster mother and the child. (*Id*. at 53).

{¶ 11} After considering the evidence presented, the trial court ruled from the bench as

follows:

> * * * [T]he Court * * * is of the belief that the circumstances in this case, although tragic for the mother in this case, the Court believes that permanent custody is in the best interest of the child. The child is doing well in the foster home. The foster home [wants] to adopt.
>
> Mom has made really very little progress, which would have required her to do things on her own initiative. The only thing that, unfortunately, she's done on her own initiative has been run away. And of course, at this particular point in time, she has obtained housing, but clearly not housing sufficient for the child. And it appears in listening to [Mother's] responses to the questions, and the answers she gives, that in many respects, she has not yet reached the level of maturity to really understand what needs to be done.
>
> And the Court believes that it's certainly not clear how soon that can happen. This child has been in foster care, really, since birth. And the Court believes that permanency requires that the Court grant permanent custody to the Agency * * *.

(Tr. Vol. II at 28-29).

{¶ 12} The trial court subsequently filed a written order granting MCCS permanent custody of J.G. (Doc. #4). It found, among other things, that J.G. had been in foster care for twelve or more of the past twenty-two months, that Mother did not satisfy all case-plan objectives, that reunification of Mother and the child was not possible within a reasonable time, that no relatives or non-relatives were willing and able to accept legal custody, that a reasonable

expectation of adoption existed, and that clear and convincing evidence demonstrated awarding MCCS permanent custody was in the child's best interest. This appeal followed.

{¶ 13}   Mother's first assignment of error states:

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO THE MONTGOMERY COUNTY CHILDREN SERVICES BECAUSE THE AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILD.

{¶ 14}   A trial court is authorized to terminate parental rights and to grant permanent custody to a children services agency if it finds, by clear and convincing evidence, that permanent custody is in a child's best interest and that the child has been in the agency's temporary custody for twelve or more months of a consecutive twenty-two-month period. *In re R.Y.*, 2d Dist. Montgomery No. 25694, 2013-Ohio-3942, ¶10. Here Mother concedes that MCCS satisfied the twelve-month requirement. She challenges only the trial court's best-interest finding, which we review for an abuse of discretion. *Id.* at ¶11.

{¶ 15}   The statutory best-interest factors include, but are not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. *Id.* at ¶12.

{¶ 16} On appeal, Mother contends that she visited with J.G. regularly and that she interacted with him appropriately. She also notes her bond with the child. Although she admits running away, she claims her absence did not significantly affect her relationship with J.G. Mother further argues that a legally secure placement can be obtained without a grant of permanent custody to MCCS. She stresses her satisfaction of some case-plan objectives and insists that "[g]iven only a few more months" she will be able to complete the others. Finally, she notes that none of the R.C. 2151.414(E)(7) through (11) factors are applicable.[1]

{¶ 17} Upon review, we see no abuse of discretion in the trial court's finding that an award of permanent custody to MCCS is in J.G.'s best interest. Although Mother interacts appropriately with J.G., the evidence demonstrates that the child interacts better, and has a better relationship, with the foster family. This is understandable given the child's long-term placement in foster care. Nevertheless, J.G.'s interaction with Mother and the foster family is a relevant best-interest consideration. The evidence demonstrates that J.G.'s custodial history is another best-interest factor weighing in favor of permanent custody to MCCS. The child has been in foster care since birth, and Mother still has not completed her case plan. Although she made some progress, she also went AWOL for five months before the dispositional hearing. She admittedly was abusing illegal substances, but she denies a substance-abuse problem and has not obtained treatment. Moreover, her testimony about her five-month absence reflects more concern about what she wanted than what was best for her child. Finally, the evidence demonstrates that J.G. needs a legally secure placement and that it cannot be achieved without a grant of permanent custody to MCCS. The record supports the trial court's finding that reunification with Mother is

---

[1]These factors address a parent's convictions, withholding food or treatment, placing a child at risk due to substance abuse, abandonment of the child, and the termination of parental rights with regard to another child.

not possible within a reasonable time and that no one else is willing and able to assume custody. MCCS also advised the trial court that no further extensions of temporary custody were permitted. Because the trial court's best-interest determination is supported by clear and convincing evidence, we overrule Mother's first assignment of error.

{¶ 18}  Mother's second assignment of error states:

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ALLOWING HEARSAY STATEMENTS TO BE ADMITTED DURING ASSINAH TAYLOR'S TESTIMONY.

{¶ 19}  This assignment of error challenges three alleged instances of hearsay testimony. The first two concern Taylor's statement that Mother and J.G. were placed in separate foster homes due to Mother's "behavioral issues" and "ongoing behavioral concerns[.]" (Tr. Vol. I at 8, 12). The third concerns Taylor's statement about it being "reported" to her that Mother needed more intensive counseling. (*Id*. at 22). We find no reversible error with regard to these statements.

{¶ 20}  The trial court actually sustained an objection to Taylor's first remark about Mother and J.G. being placed in separate foster homes due to Mother's "behavioral issues." (*Id*. at 8). Taylor then simplified her answer, stating: "Based on the information that was obtained by the Agency, as of March 8th, 2011, [J.G.] was placed in a separate foster home from his mother[.]" (*Id*. at 8-9). Although Mother again objected on the basis of hearsay, there was no dispute below that Mother and J.G. had resided in separate foster homes. Later in her testimony, Taylor explained that when she became the caseworker in September 2012, Mother was not residing with J.G. (*Id*. at 11-12). Any testimony about that background fact was not prejudicial.

**{¶ 21}** Taylor also tried a second time, however, to testify about why Mother and J.G. did not live in the same foster home. Although the trial court previously had sustained an objection, counsel for MCCS raised the issue again, asking why Mother and J.G. were not in the same foster home. Taylor responded: "Based on Agency information, due to behavioral concerns of [Mother]." (*Id*. at 12). There was no contemporaneous objection to this response, but Mother's counsel previously had made an unsuccessful continuing objection to Taylor testifying based on information obtained from other caseworkers. (*Id*. at 9).

**{¶ 22}** Even if Mother properly preserved her challenge to Taylor's testimony about "behavioral concerns" underlying the separate foster placements, we see no reversible error. The hearing transcript is replete with instances of poor behavior by Mother. We are unpersuaded that Taylor's vague reference to "behavioral concerns" was prejudicial. Moreover, the central issue below was not why Mother and J.G. had lived in separate foster homes. Rather, the question at the dispositional hearing was whether Mother then was capable of caring for the child or whether MCCS should obtain permanent custody. Any error in the admission of Taylor's statement about why Mother and J.G. had resided in separate foster homes was harmless.

**{¶ 23}** The final alleged instance of hearsay involves Taylor's testimony about it being "reported" to her by someone from Day-Mont West that Mother "needed to engage in * * * something more intensive" with regard to counseling for depression and substance-abuse issues. (*Id*. at 21-22). Mother objected to this testimony, and the trial court overruled the objection. Again, we see no reversible error. Taylor proceeded to testify, without objection and apparently based on first-hand knowledge, about a referral being made for Mother to receive additional counseling for depression and substance abuse at an agency identified as South Community. (*Id*.

at 22). The testimony that Mother challenges simply provided context, explaining why the referral to South Community was made. Even if that testimony was hearsay, we are convinced that its admission was harmless. The second assignment of error is overruled.

{¶ 24}   The trial court's judgment is affirmed.

. . . . . . . . . . . . .

FAIN and WELBAUM, JJ., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Michele D. Phipps
Bradley S. Baldwin
Hon. Nick Kuntz